[No. B095012. Second Dist., Div. Seven. Dec. 17, 1996.]

CALIFORNIA STATE EMPLOYEES' ASSOCIATION, CSU DIVISION, SEIU LOCAL 1000, AFL-CIO, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent; CALIFORNIA STATE UNIVERSITY, Real Party in Interest.

924

## COUNSEL

Gary Reynolds, Howard Schwartz and Claire Iandoli for Petitioner.

Rothner, Segall, Bahan & Greenstone, Glenn Rothner, Anthony R. Segall and Ellen Greenstone as Amici Curiae on behalf of Petitioner.

Robert G. Thompson and Bernard McMonigle for Respondent.

Christine Helwick and Donald A. Newman for Real Party in Interest.

## OPINION

JOHNSON, J.—California State Employees' Association, CSU Division, SEIU Local 1000, AFL-CIO, petitions for review of a decision of the Public

Employment Relations Board (PERB or Board). The Board rejected the proposed decision of the administrative law judge and found the California State University (CSU) had not committed an unfair labor practice by unilaterally suspending payment of merit salary adjustments without providing the union an opportunity to discuss the decision and its effects on its members.

A majority of the Board members concluded CSU did not have an established practice of paying merit salary adjustments (MSA's) and therefore CSU's obligation to fund them ceased at termination of the contract which provided for MSA's for the "duration" of the contract. In addition, the Board found CSU was statutorily prohibited from paying merit salary adjustments because the Legislature had not provided funds expressly for this purpose.

We conclude the Board's finding the CSU did not have an established practice of paying merit salary adjustments is not supported by the evidence and is contrary to established PERB precedent. We further conclude the Board's interpretation of the controlling contractual and statutory provisions is clearly erroneous. Accordingly, we reverse the Board's decision.

## FACTS AND PROCEEDINGS BELOW

The Donahoe Higher Education Act established a unified and centrally administered state college system. (Stats. 1960, 1st Ex. Sess., ch. 49, § 1, p. 397, [adding present section 66000 et seq., formerly sections 22500-22705, to the Education Code].) The act transferred administration of the state colleges from the Director of Education and State Board of Education to the trustees of the state college system. (See 37 Ops.Atty.Gen. 69 (1961); Ed. Code, present § 66606, former § 22604.) The act gave the trustees of CSU authority to decide matters concerning the selection, pay and classification of employees. (Ed. Code, §§ 66609, 89500.)

In response to an increasing demand among state employees for a formal system of collective bargaining, in the 1970's the Legislature enacted several measures to provide for collective bargaining in public employment. In 1975, the Legislature enacted the Educational Employment Relations Act (EERA). (Gov. Code, § 3540 et seq.) In 1977, the Legislature adopted the State Employer-Employee Relations Act (SEERA). (Gov. Code, § 3512 et seq.) And in 1978, the Legislature enacted the Higher Education Employer-Employee Relations Act (HEERA). (Gov. Code, § 3560 et seq.) HEERA granted the right of collective bargaining to employees in the CSU and the University of California systems. (See *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 177 [172 Cal.Rptr. 487, 624 P.2d 1215].)

In enacting HEERA the Legislature found the "people of the State of California have a fundamental interest in the development of harmonious and cooperative labor relations between the public institutions of higher education and their employees." (Gov. Code, § 3560, subd. (a).) The Legislature intended HEERA "to provide the means by which relations between each higher education employer and its employees may assure that the responsibilities and authorities granted to the separate institutions under the Constitution and by statute are carried out in an atmosphere which permits the fullest participation by employees in the determination of conditions of employment which affect them. It is the intent of this chapter to accomplish this purpose by providing a uniform basis for recognizing the right of the employees of these systems to full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of representation in their employment relationships with their employers and to select one of these organizations as their exclusive representative for the purpose of meeting and conferring." (Gov. Code, § 3560, subd. (e).)

Petitioner, The California State Employees' Association, CSU Division, SEIU Local 1000, AFL-CIO (Union), is the exclusive representative of four employee bargaining units established under HEERA.[1] In 1982 the Union and CSU entered into their first collective bargaining agreement or "memorandum of understanding." The agreement covered the period of July 1, 1982, through June 30, 1985. Apparently CSU paid merit salary adjustments for the duration of this agreement.

A subsequent agreement negotiated between the union and CSU for the period 1985 to 1989 provided "merit salary adjustments shall be subject to funds being appropriated by the Legislature and made available to the CSU specifically for merit salary adjustments." The CSU paid MSA's from 1985 to 1988. However, due to a budget shortfall and the Legislature's failure to specifically fund MSA's, CSU suspended payment of MSA's during fiscal year 1988-1989.

Historically, CSU received a specific allocation from the state budget to fund MSA's. However, the practice stopped during the administration of Governor George Dukemejian and during this period CSU apparently funded MSA's through alternative funding sources or from internal savings.

For the successor agreement the Union sought to protect its bargaining unit employees from further suspensions of MSA's by eliminating the

---

[1]The Union currently represents unit 2, which consists of health care support personnel; unit 5 which consists of operations support personnel; unit 7 which consists of clerical/administrative support personnel; and unit 9 which consists of technical support personnel.

contract language making MSA's "subject to" specific funding from the Legislature. For the 1989 to 1992 agreement—the agreement at issue in this case—the parties agreed MSA's would be paid for the term of the agreement. Section 20.19 of the agreement provided: "Merit Salary Adjustments shall be paid effective July 1, 1989, and for the duration of this agreement, subject to provisions 20.18 and 25.2."

Section 20.18 explained the criteria for granting MSA's. This section provided "[m]ovement between steps on the salary range shall be based on merit and effective performance." Section 25.2 pertained to "reopeners," or renegotiation of contract provisions, during the term of the agreement.[2] By its terms, the agreement was to expire on May 31, 1992.

The parties began negotiations on a successor agreement during the spring of 1992. The union presented its proposal on March 1, 1992. The union received CSU's proposal in mid-April 1992.[3] In early March the parties agreed their negotiations on a successor agreement would deal with the noneconomic issues first, before reaching economic issues.

On April 27, 1992, CSU's negotiator announced CSU intended to delete further provision for MSA's. CSU's proposal for the successor agreement was not to pay MSA's unless the Legislature specifically funded MSA's. CSU's announcement came at a time when the parties were still negotiating noneconomic issues.

On May 31, 1992, the parties' prior agreement expired.

On June 1, 1992, CSU's representative told the union's bargaining representative all contract terms would be continued in effect during negotiations on the successor agreement "as long as progress is being made."

On June 9, 1992, CSU's representative informed the union's representative CSU's new position was to suspend payment of MSA's but to continue all other contract terms from the prior agreement during negotiations.

CSU suspended MSA's effective June 1, 1992. At the time the parties had not discussed any economic issues. In addition, as of June 1, 1992, the Legislature had not yet adopted a budget for the 1992-1993 fiscal year.

---

[2]The article authorizing "reopeners" permits review and renegotiation of contract terms. Reasons to request to "reopen" presumably include a change in legislative funding.

[3]For reasons which are not apparent from the record CSU did not "sunshine," or submit its proposal for public comment and review, in a timely manner, which in turn delayed its submission to the union.

CSU refused to negotiate its decision to suspend MSA's and the effect of that decision on unit employees. CSU took the position it was only contractually obligated to pay MSA's "for the duration" of the agreement and the agreement by its terms expired the day before, on May 31, 1992. CSU contended it had contractual, as well as statutory, authority for its unilateral suspension of MSA's.

Prior to the suspension of MSA's, neither party had requested PERB to declare an impasse.[4] In late June the union requested impasse, which was opposed by CSU. The union withdrew the request on August 10, 1992. CSU requested impasse on November 20, 1992, which it later withdrew. The parties continued negotiations and in April 1993 reached a successor agreement.

In the meantime the union filed an unfair labor practice charge with PERB on July 6, 1992. After investigation, PERB's general counsel issued a complaint against CSU on January 11, 1993.[5] The complaint alleged that before June 1, 1992, MSA's were paid based on merit and effective performance, and that on June 1, 1992, CSU changed this policy by suspending payment of MSA's. The complaint claimed CSU took this action without affording the exclusive bargaining representative an opportunity to meet and confer over both the decision and the effects of the change in policy in violation of HEERA. (Gov. Code, § 3571, subds. (a) & (c); see fn. 5, *ante.*)

---

[4]Once a bona fide bargaining impasse is reached, either party may lawfully refuse to continue negotiations. Such an impasse triggers the statutory impasse procedure of mediation and factfinding. (See Gov. Code, §§ 3590-3594.) The parties are obligated to participate in these impasse resolution procedures and an employer may not take unilateral action during their pendency. (See, e.g., *Moreno Valley Unified School Dist.* v. *Public Employment Relations Bd.* (1983) 142 Cal.App.3d 191, 200 [191 Cal.Rptr. 60] [unilateral change during impasse resolution process is per se violation of duty to participate in impasse procedures in good faith]; see also *Modesto City Schools* (Mar. 8, 1983) PERB Dec. No. 291 [7 PERC ¶14090].)

[5]To establish PERB's jurisdiction the charging party must allege an unfair employer practice under Government Code section 3571. In this case PERB charged alleged violations of Government Code section 3571, subdivisions (c) (CSU failed to meet and confer on a matter affecting terms and conditions of employment) and (a) (such failure interfered with the unit members' right to be represented by their exclusive representative).

Government Code section 3571 provides in pertinent part: "It shall be unlawful for the higher education employer to do any of the following:

"(a) Impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter. For purposes of this subdivision, 'employee' includes an applicant for employment or reemployment.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) Refuse or fail to engage in meeting and conferring with an exclusive representative. . . ."

CSU filed its answer on January 29, 1993, admitting jurisdiction but denying any violation of HEERA. CSU further admitted suspending MSA payments on June 1, 1992. CSU asserted as affirmative defenses, among others, that the union had contractually waived its right to payment of MSA's after expiration of the prior agreement, and CSU was prohibited by statute from paying MSA's or any other cost item which had not been specifically funded by the Legislature.

An administrative law judge (ALJ) held formal hearings and at their conclusion found CSU violated HEERA by unilaterally suspending MSA's prior to completion of bargaining and the statutory impasse procedures. However, because the ALJ determined Government Code section 3572 expressly requires legislative funding before contractual provisions involving the expenditure of funds can be implemented, the ALJ concluded he did not have the authority to order payment of MSA's as a remedy.

Both the union and CSU filed exceptions to the ALJ's proposed decision with PERB. After oral arguments, the Board issued its decision (PERB Dec. No. 1093-H) on April 5, 1995. In a two-to-one decision the Board reversed the ALJ's proposed decision and found CSU had both a contractual and statutory right to suspend payment of MSA's and therefore had committed no unfair labor practice. The union filed a request for reconsideration which was denied. (PERB Dec. No. 1093a-H.)

We granted the union's petition for writ of review.

DISCUSSION

I. *Judicial Standard of Review of PERB Decisions.*

" '[T]he relationship of a reviewing court to an agency such as PERB . . . is generally one of deference.' (*Oakland Unified School Dist.* v. *Public Employment Relations Bd.* (1981) 120 Cal.App.3d 1007, 1012 [175 Cal.Rptr. 105], citing *Ford Motor Co.* v. *NLRB* (1979) 441 U.S. 488, 495 [60 L.Ed.2d 420, 426, 99 S.Ct. 1842]; accord, *Moreno Valley Unified School Dist.* v. *Public Employment Relations Bd.* (1983) 142 Cal.App.3d 191, 196 [191 Cal.Rptr. 60].) Such deference is mandated by HEERA itself. 'The findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive.' (Gov. Code, § 3564, subd. (c).)

"[The Supreme Court] recently reaffirmed the limited nature of judicial review of a labor board's determinations under the substantial evidence standard. 'Of course, we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.] We will uphold the Board's decision if it is supported by substantial evidence on the whole record. [Citations.]' (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757 [195 Cal.Rptr. 651, 670 P.2d 305], cert. den. (1984) 466 U.S. 972 [80 L.Ed.2d 819, 104 S.Ct. 2345]; see also *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 12 [154 Cal.Rptr. 893, 593 P.2d 838]; *Moreno Valley Unified School Dist.* v. *Public Employment Relations Bd.*, *supra*, 142 Cal.App.3d at p. 196.)

"Under the substantial evidence standard, when a labor board chooses between two conflicting views, a reviewing court may not substitute its judgment for that of the Board. As the United States Supreme Court has observed, 'To be sure, the requirement for canvassing "the whole record" in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does' it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.' (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467-468, 71 S.Ct. 456].)" (*Regents of University of California* v. *Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617-618 [224 Cal.Rptr. 631, 715 P.2d 590] [Supreme Court deferred to PERB's finding in-house medical staff (interns) were employees entitled to collective bargaining rights because Board's findings and interpretations were reasonable]; see also *Banning Teachers Assn.* v. *Public Employment Relations Bd.* (1988) 44 Cal.3d 799, 804-805 [244 Cal.Rptr. 671, 750 P.2d 313].)

Appellate courts also generally defer to PERB's interpretations of controlling statutory provisions. "Under established principles PERB's construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed unless it is clearly erroneous." (*San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856 [191 Cal.Rptr. 800, 663 P.2d 523]; see also

*Banning Teachers Assn.* v. *Public Employment Relations Bd.*, *supra*, 44 Cal.3d 799, 804.)

We review the issues raised in this petition with these standards in mind.

II. *The Standard for Establishing a Prima Facie Case of an Illegal Unilateral Change in the Terms and Conditions of Employment.*

■ An employer's unilateral change in terms and conditions of employment within the scope of representation is, absent a valid defense, a per se refusal to negotiate and a violation of HEERA. (Gov. Code, § 3571, subd. (c); *Regents of the University of California* (1985) PERB Dec. No. 520-H [9 PERC ¶ 16207]; *Pajaro Valley Unified School District* (1978) PERB Dec. No. 51 [2 PERC ¶ 2107]; see also *Labor Board* v. *Katz* (1962) 369 U.S. 736 [8 L.Ed.2d 230, 82 S.Ct. 1107].)

In the landmark decision of *Labor Board* v. *Katz*, *supra*, 369 U.S. 736, the National Labor Relations Board (NLRB) found a unilateral grant of merit salary increases, short of impasse and without notice to the union, constituted a per se illegal refusal to bargain. The United States Supreme Court affirmed the decision of the NLRB. "A refusal to negotiate *in fact* as to any subject which is within [the scope of representation], and about which the union seeks to negotiate, violates [the statute] though the employer has every desire to reach agreement with the union upon an over-all collective agreement and earnestly and in all good faith bargains to that end. We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of [statute], for it is a circumvention of the duty to negotiate which frustrates the objectives of [the statute] much as does a flat refusal." (369 U.S. at p. 743 [8 L.Ed.2d at p. 236], fns. omitted, italics in original.)

The Supreme Court explained its rational for finding unilateral changes by the employer particularly detrimental to employer-employee relations. "[T]he Board *is* authorized to order the cessation of behavior which is in effect a refusal to negotiate, or which directly obstructs or inhibits the actual process of discussion, or which reflects a cast of mind against reaching agreement. Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance. It follows that the Board may hold such unilateral action to be an unfair labor practice in violation of [statute], without also finding the employer

guilty of over-all subjective bad faith. . . ." (369 U.S. at p. 747 [8 L.Ed.2d at p. 238], italics in original.)[6]

PERB decisions have adopted both the holding and rationale of the *Katz* decision. Thus, under standards established by PERB, to prevail on a complaint of illegal unilateral change, the union must establish: (1) the employer breached or altered the parties' written agreement, or own established past practice; (2) such action was taken without giving the exclusive representative notice or an opportunity to bargain over the change; (3) the change is not merely an isolated breach of the contract, but amounts to a change of policy, i.e., the change has a generalized effect or continuing impact on bargaining unit members' terms and conditions of employment; and (4) the change in policy concerns a matter within the scope of representation. (*Grant Joint Union High School Dist.* (1982) PERB Dec. No. 196 [6 PERC ¶ 13064]; *Pajaro Valley Unified School District, supra*, PERB Dec. No. 51 [2 PERC ¶ 2107]; *Davis Unified School District* (1980) PERB Dec. No. 116 [4 PERC ¶ 11031].)

 The second element is not contested. The evidence established that on June 9, 1992, CSU announced the contract which terminated on May 31, 1992, would continue in effect until a new contract could be agreed upon— except for MSA's, which would be discontinued effective June 1, 1992. CSU took the position the matter was not subject to bargaining because it had only committed to fund MSA's for the "duration" of the contract, and the contract expired on May 31, 1992.

The union then suggested negotiating the matter through the statutory "impasse procedure." CSU claimed it was premature. The parties agreed to have the matter reviewed by PERB.

The third element is also satisfied. The suspension of MSA's was not merely an isolated breach of the agreement. In fact, the agreement had expired the day before on May 31, 1992. Instead, the decision to suspend MSA's changed the terms of employment for numerous bargaining members, and had a continuing effect on members' salary level which would be depressed for the balance of their employment in the CSU system.

---

[6]Our Supreme Court has frequently referred to federal precedent in interpreting parallel provisions in state labor legislation. (See, e.g., *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971]; *Regents of University of California* v. *Public Employment Relations Bd., supra*, 41 Cal.3d 601, 608-624; *Building Material & Construction Teamsters' Union, Local 216* v. *Farrell* (1986) 41 Cal.3d 651, 658 [224 Cal.Rptr. 688, 715 P.2d 648]; *Banning Teachers Assn.* v. *Public Employment Relations Bd., supra*, 44 Cal.3d 799, 807-808.)

The fourth element is also not contested. MSA's have a direct relationship to wages, which is specifically within the scope of representation. (Gov. Code, § 3562, subd. (r) [". . . 'scope of representation' means, and is limited to, wages, hours of employment, and other terms and conditions of employment. . . ."]; see also, *Regents of University of California* v. *Public Employment Relations Bd.*, *supra*, 41 Cal.3d 601, 623 [salary has direct impact on employment relationship].)

Thus, CSU's unilateral decision to suspend MSA's without permitting the union an opportunity to meet and confer on the issue, constitutes an unfair labor practice if this change altered the parties' written agreement or own established past practice.

III. *CSU'S Decision to Suspend Payment of MSA's Was a Unilateral Change Which Was Not Authorized by the Terms of the Parties' Agreement nor Required Under HEERA and Had the Effect of Altering the Status Quo.*

When CSU suspended MSA's on June 1, 1992, there was no agreement in effect because the prior agreement had expired by its terms on May 31, 1992. Consequently, CSU did not breach or alter a written agreement when it suspended MSA's the day after the existing agreement terminated on May 31, 1992.

However, a collective bargaining agreement is not an ordinary contract. An employer may not change terms or conditions of employment after expiration of such an agreement until it affords the union an opportunity to bargain over those changes. (See, e.g., *Hinson* v. *N.L.R.B.* (8th Cir. 1970) 428 F.2d 133, 136 [even after expiration of a collective bargaining agreement an employer is under an obligation to bargain with the union before he may permissibly make any unilateral change in the terms and conditions of employment]; *N.L.R.B.* v. *Cone Mills Corporation* (4th Cir. 1967) 373 F.2d 595, 598-599 [the employer's obligation to continue contract terms derives not from the contract but from the policies behind the National Labor Relations Act].)

Consequently, the terms of the expired contract must generally be maintained by the employer until bargaining on a successor agreement is completed by reaching a successor agreement, or until completion of impasse. (See *San Mateo Community College Dist.* (1979) PERB Dec. No. 105 [3 PERC ¶ 10080]; see also *Labor Board* v. *Katz*, *supra*, 369 U.S. 736 [employer must maintain status quo during negotiations]; *Industrial Union of Marine & Shipbuilding Workers of America, ALF-CIO* v. *NLRB* (3d Cir.

1963) 320 F.2d 615, 620; *Hinson* v. *N.L.R.B., supra,* 428 F.2d 133, 136.) Stated another way, whether or not an employer must continue a given term of employment depends on whether discontinuing the practice would disturb the status quo during negotiations. (*Labor Board* v. *Katz, supra,* 369 U.S. 736 [unilateral grant of benefits during contract negotiations without notice to the union, and short of impasse, constituted per se refusal to bargain].) The status quo against which an employer's conduct is evaluated must take into account the regular and consistent past patterns of terms and conditions of employment. (*Pajaro Valley Unified School District, supra,* PERB Dec. No. 51 [2 PERC ¶ 2107], relying on *Labor Board* v. *Katz, supra,* 369 U.S. 736.)

A. *The Terms of the Parties' Prior Agreement Did Not Authorize CSU to Unilaterally Suspend Payment of MSA's During Negotiations on a Successor Agreement.*

 The 1989-1992 contract provided MSA's were to be provided "for the duration of this Agreement." (§ 20.19.) The "Duration and Implementation" clause of the contract provided the "Agreement shall remain in full force and effect from June 1, 1989, up to and including May 31, 1992." (§ 25.1.)

The Board found this language evidenced the parties' intent to expressly limit payment of MSA's to the contract termination date. In essence PERB found that by using the "duration" language the union had waived the right for this term to continue after the contract expired.

 A unilateral change at expiration of a contract may be lawful if the employees' exclusive representative expressly waived its right to negotiate the subject of the change. However, a waiver will only be found when there is an intentional relinquishment of the particular right under review, and then only if it is expressed in "clear and unmistakable" terms in the parties' contract. (See, e.g., *Solano County Community College Dist.* (1982) PERB Dec. No. 219 [6 PERC ¶ 13154] ["In order for a waiver of a statutory right to be found, the District must prove the waiver by either clear and unmistakable language or demonstrable behavior amounting to a waiver of the right to meet and negotiate"]; *Redwoods Community College District* (1996) PERB Dec. No. 1141 [20 PERC ¶ 27048] [the waiver must be clear and cover all aspects of the particular matter in question].)

CSU cites several decisions in which the union had expressly waived its right to negotiate the subject of a change. For example, in *Grossmont Union High School Dist.* (1983) PERB Dec. No. 313 [7 PERC ¶ 14162] the contract repeatedly stated all teachers were to work twenty-five hours per week, and

six periods per day (five classes, one preparation period), excluding only drivers' education teachers from this requirement. Thus, PERB found it was not an unfair labor practice to also require special education teachers to teach five classes although historically they had only worked four classes and had been given two preparation periods.

Similarly in *Marysville Joint Unified Teachers Assoc.* (1983) PERB Dec. No. 314 [7 PERC ¶ 14163] the contract provided for 30-minute lunch periods. Thus, it was not an unfair labor practice for the district to enforce this provision although it had not done so in the past. (See also *Ador Corp.* (1965) 150 NLRB 168 [management had the right to drop a production line without consulting union representative because such right was expressly reserved in the parties' collective bargaining agreement in unmistakable language].)

However, when an employer asserts the defense of a claimed waiver by a union " '[c]ourts examine the defense of waiver carefully in order to ensure the protection of a party's rights, especially when these rights are statutorily based.' (*Oakland Unified School Dist.* v. *Public Employment Relations Bd.* (1981) 120 Cal.App.3d 1007, 1011 [175 Cal.Rptr. 105].)" (*Independent Union of Pub. Service Employees* v. *County of Sacramento* (1983) 147 Cal.App.3d 482, 488 [195 Cal.Rptr. 206] ["clear and unmistakable" waiver test appropriate in cases involving California public employees who do not have the remedy of a strike as do employees in the private sector].)

In reviewing the contract language we agree with the ALJ and the dissenting member in the PERB decision, the claimed waiver in this case does not even approach the requirement of "clear and unmistakable" as approved in the reported decisions. (*Independent Union of Pub. Service Employees* v. *County of Sacramento, supra,* 147 Cal.App.3d 482, 488.)

The "duration of this Agreement" language is too general and vague under existing PERB precedent for a finding the parties agreed MSA's would be singled out for termination at the contract termination date. (*Independent Union of Pub. Service Employees* v. *County of Sacramento, supra,* 147 Cal.App.3d 482, 488; *Davis Unified School District, supra,* PERB Dec. No. 116 [4 PERC ¶ 11031].) All the terms of the contract were subject to the same "duration of this Agreement" clause in the article on "Duration and Implementation." The mere repetition of the phrase "duration of this Agreement" in the provision regarding MSA's added nothing to the content or meaning of the phrase. Indeed, CSU apparently recognized this "duration" language was not a specific enough waiver to authorize it to unilaterally

change wages, health benefits or hours despite being subject to the identical "duration of this Agreement" provision.

Nor is the general phrase—"duration of this Agreement"—the equivalent of stating in clear and unmistakable terms that the parties were expressly waiving the right to have the provision for MSA's continue at expiration of the agreement while all other terms could continue during negotiations.[7] Moreover, to interpret agreement on mere "duration" language as a waiver of the statutory right to bargain would severely undermine the principles of collective bargaining by allowing widespread unilateral changes after expiration of collective bargaining agreements containing such general and innocuous language while bargaining over a successor agreement. To give this term a significance not clearly intended or expressed by the parties could wreak havoc, rather than promote harmony, in employer-employee labor relations contrary to the purposes of HEERA.

Accordingly, we conclude PERB's finding of waiver based on this general language is clearly erroneous.

Nor is PERB's finding of waiver supported by the language of section 25.4 of the parties' agreement. Clause 25.4 in the article on "Duration and Implementation" provides: "Any term of this Agreement which is deemed by the Employer to carry an economic cost shall not be implemented until the Employer determines that the amount required therefore has been appropriated and makes such amount available for expenditure for such purpose. If the Employer determines that less than the amount needed to implement this Agreement, or any provision herein has been appropriated to implement this Agreement or any provision herein, the term(s) of this Agreement deemed by the CSU to carry economic cost shall automatically be subject to the meet and confer process."

This provision is expressly designed to prevent *implementation* of any term of the collective bargaining agreement which has an economic cost if CSU determines funds are unavailable for that purpose. In this case CSU made no such determination prior to implementing the MSA provision of the agreement. Instead, it is undisputed CSU *implemented* article 20.19 of the agreement and provided payment for MSA's for the entire negotiated term of the agreement. Having implemented the MSA provision, there is nothing in article 25.4 which gives CSU the discretion to make a subsequent determination of funding unavailability. Moreover, article 25.4 would appear to

---

[7]It should be especially true in this case where the chief negotiators for each side testified that during negotiations for the 1989-1992 agreement they never discussed, and in fact never considered the subject of which, if any, terms of the contract might not remain in effect during negotiations on a successor agreement.

expressly prohibit CSU from suspending payment of MSA's once implemented without first completing the "meet and confer" process. More importantly to this case, article 25.4 does not authorize CSU to suspend its obligation under HEERA to maintain terms and conditions of employment after the agreement's expiration while the parties are negotiating a successor agreement. Consequently, PERB's conclusion that suspension of MSA's was permitted by article 25.4 of the parties' agreement is clearly erroneous and cannot be sustained.

In sum, neither article 20.19 nor article 25.4 of the parties' agreement demonstrates a clear and unmistakable waiver by the union of its right to bargain over the subject of CSU's obligation to maintain the MSA provision of the expired agreement during negotiations over a successor agreement.

> B. *Government Code Section 3572 Is Inapplicable to This Case*
> *Because It Does Not Address the Issue Whether a Contract Term*
> *Requiring Costs Continues in Effect During Negotiations Over a*
> *Successor Agreement Once the Provision Is Implemented Despite the*
> *Lack of Specific Funding.*

█ In finding CSU was not obligated to fund MSA's beyond the expiration date of the parties' agreement, PERB relied on the statutory mandate of Government Code section 3572 which generally demonstrates a legislative intent to require its approval and funding prior to imposing cost obligations on CSU.

Government Code section 3572 provides: "This section shall apply only to the California State University:

"(a) The duty to meet and confer in good faith requires the parties to begin negotiations prior to the adoption of the final budget for the ensuing year sufficiently in advance of the adoption date so that there is adequate time for agreement to be reached, or for the resolution of an impasse. The California State University shall maintain close liaison with the Department of Finance and the Legislature relative to the meeting and conferring on provisions of the written memoranda which have fiscal ramifications. The Governor shall appoint one representative to attend the meeting and conferring, including the impasse procedure, to advise the parties on the views of the Governor on matters which would require an appropriation or legislative action, and the Speaker of the Assembly and the Senate Rules Committee may each appoint one representative to attend the meeting and conferring to advise the parties on the views of the Legislature on matters which would require an appropriation or legislative action.

*"No written memoranda reached pursuant to the provisions of this chapter which require budgetary or curative action by the Legislature or other funding agencies shall be effective unless and until such an action has been taken.* Following execution of written memoranda of understanding, an appropriate request for financing or budgetary funding for all state-funded employees or for necessary legislation will be forwarded promptly to the Legislature and the Governor or other funding agencies. When memoranda require legislative action pursuant to this section, *if the Legislature or the Governor fail to fully fund the memoranda or to take the requisite curative action, the entire memoranda shall be referred back to the parties for further meeting and conferring*; provided, however, that the parties may agree that provisions of the memoranda which are nonbudgetary and do not require funding shall take effect whether or not the funding requests submitted to the Legislature are approved." (Italics added.)

Based on this statutory provision, PERB found that, absent specific funding by the Legislature, CSU had no authority to continue MSA's beyond its contractual obligation in any event.

We conclude the Board erred in finding Government Code section 3572 applicable to the situation in this case. This section describes the process of securing funding for a proposed collective bargaining agreement or "memorandum of understanding" which has just been negotiated by the parties. In the present case the parties had just begun negotiations over a successor agreement. They had not yet reached agreement. They did not have a "memorandum of understanding" which required either budgetary or curative action by the Legislature. Consequently, by its terms, Government Code section 3572 does not apply to the situation in this case, which instead involves the effect of an expired agreement during negotiations on a successor agreement, rather than a newly negotiated memorandum of understanding.

Moreover, this section does not address or discuss the parties' obligations during negotiations. It does not address the efficacy of a provision of a collective bargaining agreement which has been implemented and in effect for three years despite the absence of specific funding from the Legislature. Most significantly, Government Code section 3572 does not address, or suggest an exception to, the employer's obligation to maintain certain terms and conditions of employment contained in an expired agreement while the parties are negotiating over a successor agreement. Consequently, the statute by its terms does not apply to the issues raised in this case and therefore cannot justify the Board's conclusion.

Nevertheless, PERB found that under Government Code section 3572 CSU was without authority to continue a contractual financial obligation for which the Legislature had not provided specific funding. Under this interpretation the Board would have to find CSU was also precluded from paying salaries or granting health benefits while the parties negotiated a successor agreement until and unless the Legislature adopted a budget—however delayed beyond its mandatory deadline—which expressly provided funding for these cost items. According to the Board's interpretation, the unfunded provision providing for MSA's was illegal and CSU could have repudiated its contractual obligation at any time. As the dissenting member of PERB noted, nothing is more likely to undermine the basic purpose of HEERA than to provide the employer with the ability to unilaterally repudiate a contract term involving a condition of employment as fundamental as employee wages.

Because the Board's interpretation of Government Code section 3572 is not supported by the plain language of the statute and would also lead to undesirable and incongruous results, we reject it as clearly erroneous as well as potentially destructive of the salutary purposes of HEERA.

C. *PERB's Finding CSU Had an Established Past Practice of Suspending MSA's Which Had Not Been Specifically Funded by the Legislature Is Not Supported by Substantial Evidence.*

Since the Legislature adopted HEERA to provide for collective bargaining in higher education, the parties have only negotiated three contracts. The 1982-1985 contract apparently provided for MSA's. The 1986-1989 contract stated payment of MSA's were "subject to funds being appropriated by the Legislature and made available to the CSU specifically for merit salary adjustments." (§ 19.19.) The Legislature did not specifically fund MSA's for (at least) the 1988-1989 fiscal year and CSU suspended payment of MSA's. The issue whether the suspension of MSA's was authorized by the contract was submitted to arbitration. Although the arbitrator found CSU had failed to meet and confer before unilaterally suspending payment of MSA's, the arbitrator found it was not an unfair labor practice to suspend MSA's in that instance because the parties' contract expressly made MSA's "subject to" specific funding authorization by the Legislature and the Legislature had not provided funding for this purpose in (at least) fiscal year 1988-1989.

For the 1989 to 1992 contract the union sought to abandon the "subject to" language in favor of the "duration of the contract" language for the payment of MSA's. The union obviously prevailed on this negotiating point.

The ALJ found the suspension of payment of MSA's in 1988 was an aberration because CSU had paid MSA's for years before 1988 and for years afterward. The Board rejected this conclusion and found "the evidence shows CSU policy was to pay MSAs whenever resources permitted, the evidence also shows that CSU never abandoned its contractual and management right, consistent with its statutory duties to not pay MSAs on a permanent basis. The contract obligated CSU to pay MSAs for a limited period, which is not the same as creating a 'past practice' that established payment of MSAs as a status quo that could not be unilaterally discontinued after expiration of the prior contract and before completing negotiations on a successor contract." (PERB Dec. No. 1093-H, *supra*, at p. 18.)

After a review of the entire record, we find PERB's factual finding is unsupported by the evidence. We also conclude the Board's finding is contrary to its own established precedent because it only looked to the parties' short collective bargaining history and ignored the parties' actual historical practices.

Historical past practices are relevant in determining what is an "established practice" and therefore the status quo. In *Davis Unified School District*, *supra*, PERB Dec. No. 116 [4 PERC ¶ 11031], the Board stated "we necessarily look to pre-EERA employment conditions to determine the status quo."

In *Davis Unified School District*, *supra*, PERB Dec. No. 116 [4 PERC ¶ 11031], the issue presented was whether a public school employer could unilaterally freeze "step and column" salary increases of its employees. The Board found the school districts' unilateral changes constituted an unlawful failure to negotiate in good faith. One of the affected school districts argued the Board should exclude evidence of pre-EERA practices in determining whether the unilateral salary freeze constituted a change in established practice and the status quo. The Board rejected the argument. The Board explained that since the Legislature had only recently granted state employees the right of collective bargaining it "necessarily look[s] to pre-EERA employment conditions to determine the status quo."

Similarly, in *Pajaro Valley Unified School District*, *supra*, PERB Dec. No. 51 [2 PERC ¶ 2107], the Board examined pre-EERA conditions to determine whether the district's conduct of requiring employees to pay the higher insurance premium, alleged to be a unilateral change, was actually consistent with the district's past practice of paying a set amount for health benefits.

In *Pajaro* the school district changed carriers for health insurance benefits which resulted in substantial savings in 1974. The district and the union

agreed the savings would be applied to the costs of fringe benefits. The district paid the entire cost of those benefits for the 1974-1975 school year. During 1976 insurance premiums rose. The parties negotiated the issue whether the district would continue to bear the cost of fringe benefits. The district disputed whether it had a continuing obligation to bear the increased costs of medical insurance once the extraordinary fund was expended. In 1977 the district implemented payroll deductions to cover the increased insurance cost.

The union filed an unfair labor charge with PERB. The Board dismissed the unfair labor practice charge. It found the "record shows that the District had an established practice of paying only a prescribed amount for insurance premiums for employees pending negotiations. The one exception to this practice—where the District paid for an increase in Blue Cross benefits for the 1975-1976 year—was made because of an unexpected windfall caused by the lesser rates of a new insurer. . . ." In order to make this finding the Board had to look beyond the parties' bargaining history under EERA to determine their actual past practices and determined a single year break from historical custom does not establish a "past practice" for determining whether a unilateral change is unlawful.

In the case at bar the record evidence establishes CSU had an established past practice of paying MSA's.

The administrative record includes the written decision of the arbitrator in ruling on the legality of the suspension of MSA's in 1988. The arbitrator concluded CSU had not committed an unfair labor practice by suspending payment of MSA's in 1988 because the parties' then agreement expressly provided payment of MSA's would be "subject to" specific funding for that purpose from the Legislature, and the Legislature had not provided the funding. However, in reviewing oral and documentary evidence concerning CSU's historical practice of paying MSA's, the arbitrator found there was compelling evidence "MSAs had been awarded in a consistent manner for a substantial number of years . . . ."

At the hearing before the ALJ the director of employee relations at the chancellor's office of the California State University System testified that in the past the Legislature had provided funding for MSA's and therefore MSA's were always paid. He explained CSU even continued to pay MSA's although the Legislature had stopped providing specific funds for that purpose. When CSU suspended payment of MSA's in 1988 it had not received specific funding for MSA's for years yet had consistently paid them until its financial position worsened.

The ALJ found CSU had a past practice of paying MSA's. In its findings of fact and conclusions of law the ALJ found "[t]he consistent pattern is that MSA's were paid every year. This is true before 1988, and after 1988. That is the consistent pattern. An aberration occurred in 1988. . . ."

At oral argument before the Board, counsel for CSU acknowledged the "normal practice" was to pay MSA's.

Indeed, the Board itself acknowledged "the evidence shows CSU policy was to pay MSA's whenever resources permitted, . . ."

Consequently, the record evidence establishes CSU's actual and historical past practice was to pay MSA's and that the single suspension of MSA's in 1988 constituted an aberration which, except for its express authorization in the parties' agreement, would have constituted an unauthorized change.

The Board, however, found CSU did not have a past practice of paying MSA's because in the parties' 1986-1989 contract CSU had reserved the right not to pay MSA's unless it received specific funding for that purpose from the Legislature, and because in the 1989-1992 contract CSU had attempted unsuccessfully to similarly limit its obligation to pay MSA's.

However, based on PERB's own precedent, a single deviation from "normal" practice does not establish a new status quo. (*Pajaro Valley Unified School District, supra*, PERB Dec. No. 51 [2 PERC ¶ 2107].) Accordingly, we conclude the Board's finding CSU did not have a "past practice" of paying MSA's is not supported by the record evidence and in addition is contrary to PERB's own precedent. (*San Diego Adult Educators* v. *Public Employment Relations Bd.* (1990) 223 Cal.App.3d 1124, 1134 [273 Cal.Rptr. 53].)

In sum, we conclude the fact the Legislature did not specifically provide funds for MSA's for the year in question does not abrogate CSU's obligation to continue implemented provisions which are consistent with past practices while negotiations continue on a successor agreement.

IV. *A Make-whole Remedy Is Appropriate to Remedy an Illegal Unilateral Change in a Fundamental Term of Employment.*

Government Code section 3563.3 gives PERB broad remedial powers to remedy unfair labor practices. Under this section the Board is authorized to order "an offending party to cease and desist from the unfair practice and to take such affirmative action, including, but not limited to, the

reinstatement of employees with or without back pay, as will effectuate the policies of [HEERA]."

Restoration of the status quo is the normal remedy for a unilateral change in working conditions or terms of employment without permitting bargaining members' exclusive representative an opportunity to meet and confer over the decision and its effects. (See, e.g., *Oakland Unified School Dist.* v. *Public Employment Relations Bd.* (1981) 120 Cal.App.3d 1007, 1014-1015 [175 Cal.Rptr. 105].) This is usually accomplished by requiring the employer to rescind the unilateral change and to make employees "whole" from losses suffered as a result of the unlawful unilateral change. (See, e.g., *Compton Unified School Dist.* (1989) PERB Dec. No. 874 [14 PERC ¶ 21029] [school district ordered to restore the transportation department's overtime compensation procedure and to make whole each unit member who suffered economic harm from the district's unilateral change in compensating overtime]; *Corning Union High School Dist.* (1984) PERB Dec. No. 399 [8 PERC ¶ 15149] [district ordered to provide extra compensation or additional time off to remedy unilateral change of replacing preparation period with substituted teaching period]; *Calexico Unified School Dist.* (1983) PERB Dec. No. 357 [7 PERC ¶ 14291] [district ordered to pay backpay with interest for imposing salary freeze without first meeting and conferring with the unit members' representative]; *Regents of the University of California* (1983) PERB Dec. No. 356-H [7 PERC ¶ 14288] [Regents ordered to rescind increased parking fees and refund increased amount with interest to affected unit members]; *Oakland Unified School Dist.* (1982) PERB Dec. No. 236 [6 PERC ¶ 13201] [district ordered to provide payment to its tax shelter annuity fund with interest as remedy for unilaterally deciding to defer a portion of its required payment to subsequent year]; *Rio Hondo Community College Dist.* (1982) PERB Dec. No. 279 [7 PERC ¶ 14036] [district ordered to pay affected employees back pay with interest as remedy for unilaterally changing class size, case load, and changing compensation for summer school and physical science instructors].)

A make-whole remedy is clearly called for and appropriate in this case. (See, e.g., *Hinson* v. *N.L.R.B.*, *supra*, 428 F.2d 133, 136 [remedy for employer's illegal unilateral change in terms and conditions of employment was to restore the status quo and to make whole any losses suffered by employees because of the unfair labor practice].) CSU unilaterally and unlawfully changed a condition of employment involving the fundamental subject of unit members' wages without permitting their exclusive representative an opportunity to discuss the decision and its effects.

As we have found, Government Code section 3572 presents no legal impediment to an order directing the payment of backpay with interest

because it is inapplicable to the situation presented in this case. While Government Code section 3572 may have provided CSU an opportunity to renegotiate the term prior to implementing the provision for payment of MSA's, the fact remains CSU chose to implement the program of paying MSA's despite the lack of specific funding from the Legislature. During the term of the parties' agreement CSU paid MSA's in accordance with article 20.19 of their agreement. Thus, having implemented a program for MSA's and provided funding for this purpose, CSU may not make an argument funds are unavailable to satisfy a make-whole remedy in this case.

We conclude the appropriate remedy is to restore the status quo and to make whole those unit members denied MSA's by CSU's unlawful unilateral action. Accordingly, we remand the matter to the Board to fashion an order consistent with the views expressed in this opinion requiring CSU to make whole the affected employees. (See *Pandol & Sons* v. *Agricultural Labor Relations Bd.* (1979) 98 Cal.App.3d 580, 593 [159 Cal.Rptr. 584] [remand to the Board revests only a limited jurisdiction in the Board to follow directions of the court in the remand order].)

DISPOSITION

The PERB decision is reversed and remanded to the Board for a determination of affected employees and for an order directing CSU to pay those employees the MSA's they were denied from June 1, 1992, plus interest, until the parties reached agreement on a successor agreement. Petitioner to recover its costs.

Lillie, P. J., and Woods, J., concurred.