Filed 11/23/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CITY OF PALO ALTO,<br><br>    Petitioner,<br><br>v.<br><br>PUBLIC EMPLOYEMENT RELATIONS BOARD,<br><br>    Respondent;<br><br>INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 1319, AFL-CIO,<br><br>    Real Party in Interest. | H041407<br>(Santa Clara County<br>Super. Ct. No. SF-CE-869-M) |

Since 1978, article V of the City of Palo Alto's (hereafter, City) charter provided that impasses in negotiations regarding wages, hours, and other terms and conditions of employment for the City's police and firefighters would be submitted to binding interest arbitration. In 2011, the Palo Alto City Council (City Council) voted to place on the ballot for the upcoming election a measure that repealed this binding interest arbitration provision. Real party in interest the International Association of Firefighters, Local 1319, AFL-CIO (IAFF) filed an unfair practice charge with the Public Employment Relations Board (PERB), alleging the City placed the measure before voters without consulting in good faith with the IAFF, as required by the Meyers-Milias Brown Act (MMBA) (Gov. Code, § 3500 et seq.).[1] A PERB administrative law judge (ALJ) found in the City's

_____

[1] Unspecified statutory references are to the Government Code.

favor.  This decision was later reversed by PERB.  By that time, the measure repealing the binding interest arbitration provision had already been passed by the voters.  As part of its remedy, PERB ordered the City to rescind its resolution from 2011 referring the measure to the voters.

Pursuant to section 3509.5, the City requested this court issue a writ of extraordinary relief annulling PERB's decision and directing PERB to dismiss the unfair practice charge.  We granted a writ of review.  As we explain below, we find PERB's conclusion that IAFF sufficiently requested to meet and consult with the City is supported by substantial evidence and determine the constitutional issues raised by the City are meritless.  Nonetheless, PERB's order directing the City Council to rescind its resolution violated the doctrine of separation of powers by ordering a legislative body to take legislative action.  We therefore annul PERB's decision and remand the matter back to PERB with directions to strike this remedy.

## BACKGROUND

1. *The City's Consideration of an Amendment to the City Charter*

In 1978, the city charter was amended to add article V, titled "Compulsory Arbitration for Fire and Police Department Employee Disputes."  Section 4 of article V provided:  "All disputes or controversies pertaining to wages, hours, or terms and conditions of employment which remain unresolved after good faith negotiations between the city and either the fire or police department employee organization shall be submitted to a three-member board of arbitrators upon the declaration of an impasse by the city or by the recognized employee organization involved in the dispute. [¶] . . . [¶] At the conclusion of the arbitration hearings, the arbitration board . . . shall decide each issue by majority vote by selecting whichever last offer of settlement on that issue it finds most nearly conforms with those factors traditionally taken into consideration in the

2

determination of wages, hours, and other terms and conditions of public and private employment . . . ."

On April 12, 2010, the city manager prepared a report to the City Council. The report indicated the City was facing a budget deficit of $8.3 million in 2011. The report also provided suggestions on how to balance the City's budget.

In May 2010, the Santa Clara County civil grand jury issued a report that analyzed the employment costs of cities within the county. In part, the report noted that in times of economic boom, cities had opted to attract qualified candidates with increased wages and pension benefits, which were largely guaranteed by union collective bargaining agreements. The report noted that binding interest arbitration had compounded the problem in the City of San Jose. Suggestions were provided on how cities could address the issues caused by increasing costs and included a discussion about binding arbitration. The report noted: "Binding arbitration is not open to the public and results in an adversarial process between the city and employee groups. Binding arbitration limits the ability of city leaders to craft solutions that work for the city's budget. The process has resulted in wage and benefit decisions that have been greater than the growth in basic revenue sources." The report recommended the City of San Jose prepare a ballot measure repealing the section of its city charter dealing with binding arbitration. No specific recommendations were made to the City to take similar action.

The City Council reviewed the report and discussed its findings. In particular, the City Council focused on the report's analysis of binding arbitration. On July 19, 2010, the City Council directed its staff to prepare a measure repealing binding arbitration in article V of the city charter, which was to be placed on the November 2010 ballot.

2. *Initial Communications Regarding the City's Consideration of the Ballot Measure*

On July 22, 2010, attorneys for the Palo Alto Police Managers Association (PMA) wrote a letter to the city manager. The PMA told the City that it was obligated to comply

3

with the meet and confer requirements of the MMBA before taking any action on the proposed charter amendment to repeal article V, citing to *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591 (*Seal Beach*).

The following day, Tony Spitaleri, president of the IAFF, also wrote a letter to the city manager. Spitaleri joined in the PMA's assertion that the City was required to meet and confer with the IAFF and other recognized employee organizations under the MMBA. Spitaleri noted that in 2010, the City of Vallejo complied with the MMBA's meet and confer requirement before it placed a measure repealing binding arbitration on its ballot. At the conclusion of his letter, Spitaleri urged the city manager to "begin a dialogue with [the IAFF] and with other labor organizations which would be affected by any effort to remove or modify the Article V requirements."

On July 26, 2010, Russell Carlsen with the City's department of human resources responded to Spitaleri's letter. Carlsen advised Spitaleri that the City Council was going to consider the repeal of the binding arbitration provision in article V during its July 26, 2010 meeting and was intending on placing the measure on the ballot at its August 2, 2010 meeting. Carlsen then stated: "Interest arbitration provisions are a permissive, not mandatory, subject of bargaining (*see DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 255-57; *City of Fresno v. [People ex rel.] Fresno Firefighters, IAFF Local 753* (1999) 71 Cal.App.4th 82, 96-97). As such, meet and confer is not required. However, if you have questions or comments about the Council's proposal you may contact me or attend the Council meetings on July 26 and August."

That same day, Gary Baum, the city attorney, wrote to the City Council, addressing the meet and confer issue raised by the IAFF and the PMA. Baum opined that the City had no obligation to meet and confer with the labor organizations under the MMBA. Baum reasoned that the MMBA only required the City to meet and confer about matters within the scope of representation, such as employee wages, hours, and working

4

conditions. Baum noted that the IAFF and the PMA relied on *Seal Beach*. Baum, however, concluded that *Seal Beach* was distinguishable.

On August 2, 2010, the City Council held a meeting and discussed the proposed ballot measure to repeal binding arbitration in article V. Councilmember Holman moved to adopt a resolution calling to place before the voters the measure repealing binding arbitration at a special election on November 2, 2010. The motion failed by a vote of five to four. The City Council then directed its staff to "return in the fall with a timeline for consideration of binding arbitration and ideas through study sessions, outreach to the community organizations, in order to get background information and benchmarking data."

3. *The Policy and Services Committee's Consideration of the Proposed Ballot Measure to Repeal Article V*

After the City Council's meeting in August 2010, the City's policy and services committee began considering a measure to repeal the binding arbitration provision in article V. In May 2011, the City staff prepared a report with information about the proposal to repeal binding interest arbitration.

On May 3, 2011, Sandra Blanch, the City's interim human resources director, wrote a letter to Spitaleri informing him that the policy and services committee would begin discussing a potential measure repealing binding arbitration on May 10, 2011. The letter informed Spitaleri that if he wished to "meet and discuss regarding this issue," he should contact Marcie Scott at the City's human resources department.

That same day, Spitaleri wrote an e-mail to Scott. Spitaleri asked if Blanch's letter was "a request to meet and confer over possible changes to Article V prior to the Policy and Services Standing Committee meeting on May 10." Spitaleri did not receive a response to the e-mail. He later left Blanch a voicemail following up on whether her letter was a request to meet and confer. Spitaleri did not receive a response from Blanch.

5

During the hearing on the IAFF's unfair practice charge, Scott testified that she did not receive the e-mail from Spitaleri, because her e-mail inbox had been full.

On May 10, 2011, the policy and services committee provided the City Council with a report reviewing the binding interest arbitration provision in the city charter. The report summarized the binding interest arbitration provision and binding interest arbitration decisions in the City, analyzing their impact. The report remarked that one of the primary criticisms of binding arbitration was that it delegated decisionmaking authority to an unelected third party who was not responsible or accountable to citizens. The report also included a table listing future election dates and deadlines for submitting proposed ballot language. The report concluded that if the committee determined that the interest arbitration provision did not meet the City and the citizens' needs, it may recommend modifying or repealing the binding interest arbitration provision. Spitaleri was sent a copy of the report.

The policy and services committee held a meeting on the matter that day. During the meeting, City Attorney Molly Stump expressed her opinion that *Seal Beach* applied to the City Council's consideration of the ballot measure. Stump noted that a "meet and confer" did not require the parties to reach an agreement; rather, the parties were to make a good faith attempt to narrow their differences and exchange information. An attorney for the PMA spoke during the meeting. Spitaleri did not attend the meeting, but the IAFF's secretary attended. The policy and services committee did not reach a conclusion regarding binding interest arbitration and continued the matter to June 7, 2011, pending further research on how binding interest arbitration impacted other cities outside of Santa Clara County and California.

On June 3, 2011, Scott sent Spitaleri an e-mail containing a link to an agenda and a packet of information detailing the policy and services committee's discussion regarding binding interest arbitration.

6

On June 7, 2011, the policy and services committee convened and discussed binding interest arbitration again.  The committee was unable to reach a consensus on how to proceed.  It then forwarded the matter to the City Council for a policy decision on whether to proceed with a ballot measure to either repeal or modify article V.

On June 16, 2011, Ron Watson, the president of the PMA, sent an e-mail to Scott reiterating the PMA's desire to meet and confer about the proposed measure to repeal or modify binding interest arbitration.  Scott replied to Watson's e-mail and informed him that she was unaware of what steps the City Council would take, and once the City Council had determined its next steps she would contact Watson and they could discuss how to move forward.  On June 18, 2011, Scott sent an e-mail to Watson and to Spitaleri with a link to the City Council's agenda for June 20, 2011.  Binding interest arbitration was set to be discussed at that meeting.

4. *The City Council's Consideration of Modifying or Repealing Interest Arbitration*

The City Council held a special meeting on June 20, 2011.  Scott advised the City Council that the policy and services committee was seeking direction on how to proceed and whether to pursue repeal or modification of the binding arbitration provision.  The chair of the policy and services committee stated that the committee was evenly split on whether to modify or to repeal binding interest arbitration.

Spitaleri spoke on behalf of the IAFF.  Spitaleri explained that he believed the firefighters presently had a fair process through which they could settle labor disputes.  The IAFF opposed repealing the binding arbitration provision in article V and recommended the matter be returned to the policy and services committee where all affected labor organizations could participate in the discussion and make recommendations to the City Council.  Spitaleri opined that denying labor organizations a chance to participate could harm relations in the future.  Barry Marchiso, another member of the IAFF, also advocated that the issue be returned to the policy and services

7

committee to give organizations a chance to participate in discussions regarding potential revisions to the interest arbitration provision.

The City Council was split on the issue of repeal versus modification. Some council members spoke in favor of modifying binding arbitration in some way. Ultimately, the City Council voted to refer the matter back to the policy and services committee with directions for the committee to (1) draft language providing for significant modifications to the binding interest arbitration provision, (2) provide language repealing the interest arbitration provision, and (3) return with a recommendation on when the election should occur, should there be a need for one. The policy and services committee was to report back to the City Council by June 25, 2011.

On June 28, 2011, the policy and services committee held a meeting and again discussed binding interest arbitration. Following a discussion, the committee directed its staff to draft a ballot measure repealing the binding arbitration provision in article V, an alternative ballot measure modifying binding arbitration, and an ordinance requiring mandatory mediation. Although the IAFF did not present anything, the secretary of the IAFF attended the meeting. Spitaleri later explained that the IAFF was aware that interest arbitration was going to be discussed at the meeting. The IAFF, however, was told only that they could present their opinions to the committee by speaking at the meeting at the microphone. To Spitaleri, this did not mean the IAFF would have an opportunity to participate in a dialogue with the policy and services committee about interest arbitration, and it was not the type of discussion or participation that Spitaleri believed was required under the MMBA.

On July 11, 2011, Scott sent Spitaleri an e-mail notifying him that the policy and services committee was going to meet again the following day. Attached to the e-mail were several documents prepared by Stump, including a draft resolution repealing the

8

binding interest arbitration provision in article V, a draft resolution modifying binding arbitration, and a draft ordinance requiring mediation.

On July 12, 2011, the policy and services committee held another meeting about binding interest arbitration. The committee voted to present to the full City Council a draft resolution repealing article V and enacting an ordinance providing for mandatory mediation effective upon the repeal of article V for the November 8, 2011 election.

On July 17, 2011, Scott sent Spitaleri an e-mail informing him that the full City Council would be considering binding interest arbitration at its meeting the following night. Attached to the e-mail were documents containing the agenda packet for the meeting.

The city attorney's office prepared a report dated July 18, 2011, which again opined that the City was not required to meet and confer with labor organizations, because interest arbitration was a permissive, not a mandatory, subject of bargaining. The city attorney's report indicated that staff provided fire and police organizations with the opportunity to informally discuss and comment on the proposal by alerting them of the dates of the policy and services committee meetings when interest arbitration was discussed. The report noted that the organizations did not submit any oral or written comments during the meetings.

5. *The City Council's Approval of a Resolution to Place on the November 8, 2011 Ballot a Measure to Repeal Binding Interest Arbitration*

On July 18, 2011, the City Council met and discussed binding interest arbitration. During the meeting, Spitaleri spoke and requested the City Council adhere to section 3507 and the MMBA and consult in good faith with representatives of recognized employee organizations before adopting procedures for the resolutions of disputes involving wages, hours, and other terms and conditions of employment. Mayor Espinosa asked Stump whether there was noncompliance with the MMBA, and Stump responded

9

that there was a threat of noncompliance but that binding arbitration was not a matter that was within the mandatory scope of bargaining.

Following the public comment period, the City Council passed a motion to adopt a resolution calling a special election for November 8, 2011, to submit to the electorate a measure to repeal article V to eliminate the binding interest arbitration requirement. The City Council also approved a motion adding a section to the City's municipal code requiring nonbinding mediation for impasses in labor negotiations with all recognized employee organizations.

After the meeting, Spitaleri spoke with Darrell Murray, the City's chief labor negotiator, outside the City Council chambers. Spitaleri asked Murray to respond to his earlier request that the City comply with the MMBA and consult with the IAFF. Murray told Spitaleri to send him an e-mail, which Spitaleri did. Later, Murray responded to Spitaleri's e-mail, writing that Scott had told him to send Spitaleri a copy of the staff report that set forth the City's position on whether a consultation was necessary. The staff report was the one prepared by Stump, the city attorney, which concluded the city was not required to negotiate over the repeal or amendment of article V.

6. *The IAFF Initiates an Unfair Practice Charge Against the City*

On July 28, 2011, the IAFF filed an unfair practice charge against the City with PERB. The IAFF alleged that the City had violated the MMBA when it failed to consult with labor organizations over the proposed ballot measure.

On August 1, 2011, Stump sent a letter to the IAFF. The letter stated that Stump had reviewed the IAFF's unfair practice charge, and the City had learned, for the first time from the unfair practice charge, that the IAFF was interested in meeting with the City regarding the proposed ordinance establishing mandatory mediation. At that time, the mediation ordinance had not been finally adopted by the City Council. To provide an additional opportunity for a dialogue with the union, the City staff had removed the

10

mediation ordinance from the upcoming City Council meeting's agenda. Stump proposed several dates for meetings to discuss the mediation ordinance. The letter did not mention the IAFF's request to meet regarding the repeal of binding interest arbitration.

On November 8, 2011, the election took place and the ballot measure repealing the binding arbitration provision in article V was passed.

7. *PERB's Decision*

On September 7, 2011, PERB's general counsel filed a complaint alleging the City had engaged in unfair practices in violation of the MMBA. In part, the complaint alleged the City failed to consult in good faith with the IAFF regarding the ballot measure to repeal binding arbitration.[2]

An evidentiary hearing took place before an ALJ. Following the hearing, the ALJ issued a proposed decision in November 2011. The decision noted that section 3507 required that a public agency adopt reasonable rules regarding additional procedures for the resolution of disputes based on matters within the scope of representation after a "consultation in good faith." Section 3507 was distinct from section 3505, which requires a public agency to meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of recognized labor organizations. The ALJ determined the process mandated by the "consultation in good faith" requirement under section 3507, however, was very similar to the process mandated by the "meet and confer" requirement set forth under section 3505.

Based on the evidence presented, the ALJ concluded that the City had provided the IAFF with written notice for an opportunity to meet within a reasonable period of time. The IAFF, however, had not requested to consult in good faith in a timely fashion.

---

[2] The complaint also charged the City with failing to meet over the mediation ordinance. Later, this charge was dismissed following the evidentiary hearing.

11

The ALJ opined that by mid-June 2011, Spitaleri should have been aware that the measure had to be approved by August 1, 2011, if it was to be on the November 8, 2011 ballot. On June 18, 2011, when Spitaleri asked the City Council to abide with the MMBA, the request was no longer timely.

Both the City and the IAFF filed exceptions to the ALJ's proposed decision. On August 6, 2014, PERB issued its final decision on the matter. PERB's decision adopted the ALJ's conclusion that section 3507 and the consultation process set forth therein was akin to the meet and confer process set forth under section 3505. PERB held that under section 3507, a public agency must: "(1) provide reasonable written notice to each employee organization affected by the rule or regulation proposed for adoption or modification by the agency; and (2) afford each such organization a reasonable opportunity to meet and discuss the rule or regulation prior to the agency's adoption." (Fn. omitted.) Additionally, PERB concluded that "section 3507 imposes on a public agency and on recognized employee organizations, several mutual obligations in the conduct of consultation, which are to: (1) meet and confer regarding consultation subjects promptly upon the request by either party; (2) continue meeting and conferring for a reasonable period of time in order to exchange freely information, opinions and proposals; and (3) endeavor to reach an agreement."

PERB then concluded, contrary to the ALJ, that the IAFF did not waive its right under the MMBA to consult in good faith with the City. PERB determined that the IAFF had requested to discuss the issue with the City as early as July 2010. This request was acknowledged but denied. Again, in June 2011, the City acknowledged the IAFF's desire to discuss the issue with the City, but the City confined the discussion to participation in public meetings. And on July 18, 2011, the IAFF again requested to meet with the City, but the City acted unilaterally and refused to meet with the IAFF on the issue.

12

Citing these facts, PERB concluded that the IAFF had not waived its right to meet and consult under the MMBA.

Although PERB determined that the City had violated the MMBA, it also held it could not overturn the election results repealing article V. PERB concluded a quo warranto writ is the exclusive remedy in these types of situations. PERB, however, found it had the authority to direct the City Council to rescind the July 18, 2011 resolution referring to the voters the ballot measure. Thereafter, interested persons, including the IAFF, could seek quo warranto relief from the courts. PERB also directed the City to cease and desist from further unlawful conduct in violation of the MMBA and to post a notice incorporating the terms of the order at all work locations where notices to unit employees are customarily posted.

## DISCUSSION

The City, along with amicus curiae from the League of California Cities (League), takes issue with PERB's decision. First, the City claims that PERB's legal determination that the City was required to consult in good faith over the ballot measure repealing binding interest arbitration undermined well-established law. Second, the City argues that PERB erred when it concluded that the IAFF had not waived its right to consultation. Lastly, the City argues that PERB lacked authority to order the City Council to rescind its action placing the measure repealing article V on the ballot, and the decision is an impermissible advisory opinion since it cannot change the results of the election. PERB and the IAFF reject these arguments and insist that PERB's decision was sound.

1. *Standard of Review*

Before we address the merits of the City's claims, we first discuss the appropriate standard of review that must be applied to this case.

"As the expert administrative agency established by the Legislature to administer collective bargaining for covered governmental employees, PERB has exclusive initial

13

jurisdiction over conduct that arguably violates the MMBA." (*San Diego Municipal Employees Assn. v. Superior Court* (2012) 206 Cal.App.4th 1447, 1458.) "PERB is specifically empowered to 'determine in disputed cases whether a particular item is within or without the scope of representation' and to investigate unfair practice charges and 'take such action and make such determinations in respect of such charges . . . as the board deems necessary to effectuate the policies of [the MMBA].' " (*San Mateo City School Dist. v. Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 856, superseded by statute on other grounds as stated in *California School Employees Assn. v. Bonita United School Dist.* (2008) 163 Cal.App.4th 387.) PERB's construction of a statute within its legislatively designated field of expertise will be regarded with deference and will be followed unless it is clearly erroneous. (*Ibid.*) And PERB decisions are persuasive authority on legal matters that are within its expertise. (*San Lorenzo Education Assn. v. Wilson* (1982) 32 Cal.3d 841, 850.)

Noting the deference afforded to PERB over matters within its expertise, the City argues PERB should not be given deference over its interpretation of the election law or constitutional law issues raised by this case. However, it is "settled precedent that PERB may construe employee relations laws considering constitutional precedent" (*San Diego Municipal Employees Assn. v. Superior Court*, *supra*, 206 Cal.App.4th at p. 1458; *Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 583), and PERB's construction of statutes such as sections 3505 and 3507 fall squarely within its expertise.

Nonetheless, we agree with the City that " '[i]t is, however, "the duty of this court, when . . . a question of law is properly presented, to state the true meaning of the statute . . . even though this requires the overthrow of an earlier erroneous administrative construction." ' " (*Cumero v. Public Employment Relations Bd.*, *supra*, 49 Cal.3d at p. 587.) Thus, if PERB's interpretation is clearly erroneous, we will not follow it.

14

A different standard of review applies to PERB's determinations of fact. As the City notes, PERB did not accept all of the ALJ's conclusions of fact. In situations where parties file exceptions to an ALJ's proposed decision, PERB reviews the record de novo "and is empowered to reweigh the evidence and draw its own factual conclusions." (*California Teachers Assn. v. Public Employment Relations Bd.* (2009) 169 Cal.App.4th 1076, 1086.) PERB is not bound by the ALJ's determination of the weight to be accorded to each piece of evidence. " '[PERB], not the hearing officer, is the ultimate fact finder, entitled to draw inferences from the available evidence.' " (*Id.* at p. 1087.)

PERB's determination on factual issues is upheld if supported by substantial evidence. (*California State Employees' Assn. v. Public Employment Relations Bd.* (1996) 51 Cal.App.4th 923, 932-933 (*California State*).) " 'Under the substantial evidence standard, when a labor board chooses between two conflicting views, a reviewing court may not substitute its judgment for that of [PERB].' " (*Id.* at p. 933.) The reviewing court may not reweigh the evidence; if there is a plausible basis for PERB's factual decisions " ' "we are not concerned that contrary findings may seem to us equally reasonable, or even more so." ' " (*Ibid.*)

The City asserts that this court must review the entire record to determine whether substantial evidence supports PERB's factual determinations. The City is correct; PERB's factual findings must be "supported by substantial evidence on the record considered as a whole." (§ 3564, subd. (c).) Nonetheless, " '[a]s the United States Supreme Court has observed [in a similar context], "To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess

and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." ' " (*California State*, *supra*, 51 Cal.App.4th at p. 933.)

2. *The City was Required to Consult with the IAFF Under Section 3507*

First, we must examine whether PERB's decision that the City was required to consult with labor organizations under the MMBA is sound. In order to determine whether the City was required to consult, we first examine whether binding arbitration is within the scope of representation of the MMBA. And if so, what actions the City must have taken in order to be in compliance with the MMBA.

a. **Binding Arbitration Is a Mandatory Subject of Consultation Under Section 3507**

In its decision, PERB concluded that although binding arbitration is a permissive, not mandatory, subject of bargaining under sections 3504 and 3505, the duty to consult in good faith under section 3507 is distinct both conceptually and by its own terms. Therefore, binding arbitration is properly considered a mandatory subject of consultation under section 3507.

The City and the League argue that PERB's conclusion goes against long-standing precedent finding that binding arbitration is not a mandatory subject of bargaining. In *DiQuisto v. County of Santa Clara*, *supra*, 181 Cal.App.4th 236 (*DiQuisto*) this court held that "interest arbitration is not a mandatory subject of contract negotiations" but is a "permissive subject about which the parties properly may meet and confer." (*Id*. at p. 257.) *DiQuisto*, however, is not directly on point. *DiQuisto* contemplated binding arbitration in the context of the duty to "meet and confer" under section 3505 and did not address the duty to consult in good faith under section 3507.

16

*City of Fresno v. People ex rel. Fresno Firefighters*, *supra*, 71 Cal.App.4th at pages 97 through 98 (*Fresno Firefighters*), also relied on by the City, is similarly not dispositive. There, the appellate court found that an interest arbitration clause was a permissive, not mandatory, subject of bargaining under the National Labor Relations Act (NLRA) and construed that binding arbitration was also not a mandatory subject of bargaining under sections 3504 and 3505. (*Fresno Firefighters*, *supra*, at pp. 97-98.) A conclusion that binding arbitration is not a mandatory subject of bargaining under sections 3504, 3505, and the NLRA—which does not include a provision similar to section 3507—does not automatically render binding arbitration outside the purview of the good faith consultation requirement set forth under section 3507.

This is because there are distinctions between sections 3504, 3505, and 3507, both in their language and in their purposes. Section 3504 defines "scope of representation" as including "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." Section 3505 requires employers to "meet and confer" with employee organizations "regarding wages, hours, and other terms and conditions of employment."

Section 3507, however, states that employers "may adopt reasonable rules and regulation after consultation in good faith" (§ 3507, subd. (a)) with labor organizations for the administration of employer-employee relations under the MMBA, including "[a]dditional procedures for the resolution of disputes involving wages, hours and other terms and conditions of employment" (*id*., subd. (a)(5)) and "[a]ny other matters that are necessary to carry out the purposes of this chapter" (*id*., subd. (a)(9)).

17

Thus, section 3504 discusses a labor organization's authority to represent its members in certain employer relations disputes, such as those that involve wages. Section 3505 provides that public agencies must meet and confer in good faith with representatives of recognized employee organizations before determining policy or courses of action regarding wages, hours, and other terms and conditions of employment. Section 3507, on the other hand, deals with public agencies' ability to establish reasonable rules and regulations regarding the administration of employer-employee relations under the MMBA. And section 3507 subjects the development of these reasonable rules and regulations to a requirement that the public agency must first consult with recognized employee organizations. Therefore, it is not paradoxical or illogical to conclude that a provision regarding binding arbitration does *not* fall within the scope of representation set forth under sections 3504 and 3505 (i.e., wages, hours, and terms of conditions of employment), but is a mandatory subject of consultation under section 3507. According to its plain language, section 3507 encompasses matters that do not necessarily trigger the duty to meet and confer under section 3505.

Furthermore, the City's claim that PERB has illogically concluded that binding arbitration falls outside the scope of representation for purposes of section 3504 but within the scope of representation under section 3507 fails to acknowledge that cases like *DiQuisto* and *Fresno Firefighters* interpreted the scope of representation under sections 3504 and 3505. (See *DiQuisto*, *supra*, 181 Cal.App.4th 236; *Fresno Firefighters*, *supra*, 71 Cal.App.4th at pp. 97-98.) We reiterate that these cases did not discuss section 3507. And the City and the League do not cite to authority or cogently explain why matters that are the mandatory subject of a consultation in good faith under section 3507 *must* be within the mandatory scope of representation under sections 3504 and 3505. As PERB stated in its decision, "the mandatory subjects for consultation specified in section 3507 concern the very system of collective representation established

18

by the MMBA, and not employee wages, hours and terms and conditions of employment" that are subject to meeting and conferring under sections 3504 and 3505.

Similarly, the League and the City argue that section 3504's scope of representation provides certain exceptions. "[T]he scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3504.) The exception stated in section 3504 was meant to exclude agencies from the duty to bargain if an action, even if it has adverse effects on wages, hours, or working conditions, was taken "pursuant to a fundamental managerial or policy decision." (*Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 660.) If so, it is "within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question." (*Ibid.*) The City and the League argue the exception applies. However, as we just discussed, the City and the League fail to offer support for their contention that section 3504 (and section 3505, for that matter) limits the matters that are subject to good faith consultation under section 3507.[3]

---

[3] Additionally, the City raises this argument for the first time in its reply brief. " 'Points raised for the first time in a reply brief will ordinarily not be considered, because such consideration would deprive the respondent of an opportunity to counter the argument.' [Citation.] 'Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant.' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Although the League addresses these arguments in its amicus brief curiae, we could still decline to address this contention, because it was not raised in the City's opening brief. " 'Amicus Curiae must accept the issues made and the propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered.' [Citations.] Otherwise, amicus curiae, rather than the parties themselves, would control the issues litigated. It would also be inappropriate for amicus curiae unilaterally to augment the scope and thus the cost of litigation to the opposing party." (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (2001) 90 Cal.App.4th 1151, 1161, fn. 6.)

Lastly, the City casts doubt on whether binding arbitration can properly be considered an additional procedure for resolution of disputes under section 3507. The City argues that *Bagley v. City of Manhattan Beach* (1976) 18 Cal.3d 22 confirms that it cannot. The City relies on a statement from *Bagley*, where the court commented that "the Meyers-Milias-Brown Act provides for negotiation and *permits the local agency and the employee organization to agree to mediation but not to fact-finding or binding arbitration*." (*Id*. at p. 25.) *Bagley*, however, did not consider whether binding arbitration is a permissive or mandatory subject of bargaining under any of the provisions of the MMBA. Rather, *Bagley* held that the statutory duty of a general law city to fix compensation for its employees could not be delegated to an arbitrator when impasses in salary negotiations arose. (*Id*. at p. 26.) As often stated by the California Supreme Court, "cases are not authority for propositions not considered." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 374.) The City's reliance on *Bagley* is therefore misplaced.

In sum, PERB articulated in its decision that the matters that are mandatory subjects for consultation under section 3507 are distinct from the mandatory subjects of meeting and conferring under sections 3504 and 3505. PERB's interpretation of the MMBA is within its legislatively designated field of expertise, so we must defer to its analysis unless it is clearly erroneous. In this case, we do not believe PERB's interpretation of section 3507 is clearly erroneous.

b. **Scope of Duty to Consult (§ 3507) Compared with Duty to Confer (§ 3505)**

Section 3505 provides in pertinent part: "The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations." Section 3505 describes that

20

" '[m]eet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent."

On the other hand, section 3507 operates to restrict a public agency from adopting reasonable rules and regulations for the administration of employer-employee relations unless it has a "consultation in good faith" with recognized employee organizations. The rules of regulations contemplated by section 3507 include "[a]dditional procedures for the resolution of disputes involving wages, hours and other terms and conditions of employment." (§ 3507, subd. (a)(5).)

Section 3507 does not specifically describe the "consultation in good faith" process that is contemplated by the statute. PERB, along with the ALJ, concluded that the "consultation in good faith" mandated by section 3507 is very much like the "meet and confer" process mandated under section 3505.[4]

Again, we defer to PERB's analysis on this point. As PERB noted in its decision, multiple appellate court decisions have reached the very same conclusion. (*Independent*

---

[4] In its decision, PERB laid out three mutual obligations for public agencies and recognized employee organizations to have during the conduct of consultation, requiring the parties to: "(1) meet and confer regarding consultation subjects promptly upon the request by either party; (2) continue meeting and conferring for a reasonable period of time in order to exchange freely information, opinions and proposals; and (3) endeavor to reach an agreement."

21

*Union of Pub. Service Employees v. County of Sacramento* (1983) 147 Cal.App.3d 482, 488 ["In a related context, it has been held that ' "consultation in good faith" ' is the equivalent of ' "meet and confer in good faith" ' "]; *Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 821 (*Vernon*); *International Assn. of Fire Fighters Union v. City of Pleasanton* (1976) 56 Cal.App.3d 959, 976 ["We perceive no basis for distinguishing between the term 'consultation in good faith,' as used in section 3507, and the 'meet and confer in good faith' process defined in section 3505."].)

The City recognizes that appellate courts have consistently held that the duty to meet and consult under section 3507 and the duty to meet and confer under section 3505 are comparable.  The City, however, argues these cases should not be followed, because they fail to analyze the impact of the Legislature's use of different language (confer as compared to consultation in good faith) in the statutes.  In fact, the City notes that some of the cited cases offer no analysis at all, simply declaring that the meet and confer requirements are comparable to the consultation in good faith requirement.  The City insists that PERB's decision contradicts the established principle of statutory construction that " '[w]hen the Legislature uses different words as part of the same statutory scheme, those words are presumed to have different meanings.' " (*Roy v. Superior Court* (2011) 198 Cal.App.4th 1337, 1352.)

We are not persuaded by the City's argument.  Canons of statutory construction are meant to provide guidance in interpreting a statute.  However, they " 'are "merely aids to ascertaining probable legislative intent." [Citation.]  No single canon of statutory construction is an infallible guide to correct interpretation in all circumstances.'  '[The canons] are tools to assist in interpretation, not the formula that always determines it.' " (*Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1013, fn. omitted.) Aside from pointing out that the Legislature utilized different language in sections 3505 and 3507, the City does cite to actual evidence in the statutes' legislative history that

22

would indicate that the Legislature intended for them to have different meanings.[5] Furthermore, PERB's decision did not state the two duties were indistinguishable from each other. Rather, PERB held that the consultation in good faith requirement was very similar to the duty to meet and confer.

PERB's decision also conforms to its prior precedent. The City argues that in *San Dieguito Union High School Dist*. (1977) EERB Dec. No. 22E [1 PERC ¶ 369] (*San Dieguito*), PERB analyzed the employer's duty to consult under the Educational Employment Relations Act (EERA) (§ 3540 et seq.) and interpreted this duty differently. We disagree.

The City misreads PERB's decision in *San Dieguito*, which found the duty to consult under the EERA was equivalent to the duty to " 'meet and confer' " as used under the now-repealed Winton Act.[6] (*San Dieguito*, *supra*, EERB Dec. No. 22E at p. 12, fn. 11.) Under the Winton Act, " '[m]eet and confer' mean[t] that a public school employer, or such representatives as it may designate, and representatives of employee organizations shall have the mutual obligation to exchange freely information, opinions, and proposals; and to make and consider recommendations under orderly procedures in a conscientious effort to reach agreement by written resolution, regulation, or policy of the governing board effectuating such recommendations." (*Ibid*.) The language of this definition bears a striking resemblance to the definition of "meet and confer" set forth under section 3505.

---

[5] In its reply brief, the City argues the statute's legislative history dictates a different result. The City, however, still does not cite to anything in the sections 3505 and 3507's legislative histories that would support its argument. Instead, the City merely rehashes its earlier argument that the Legislature must have intended a different result, because it used different language (consult instead of meet and confer) in section 3507.

[6] In 1975, the Legislature repealed the Winton Act and replaced it with the EERA. (*Board of Education v. Round Valley Teachers Assn*. (1996) 13 Cal.4th 269, 279-280.)

Furthermore, *San Dieguito* focused on distinguishing the duty to consult under the EERA and the duty to negotiate. (*San Dieguito*, *supra*, EERB Dec. No. 22E at pp. 10-11.) "Meeting and negotiating," as defined under section 3540.1, subdivision (h), "means meeting, conferring, negotiating, and discussing by the exclusive representative and the public school employer in a good faith effort to reach agreement on matters within the scope of representation and the execution, if requested by either party, of a written document incorporating any agreements reached, which document shall, when accepted by the exclusive representative and the public school employer, become binding upon both parties . . . ." As noted in *San Dieguito*, unlike the duty to meet and negotiate, the duty to consult "means that a school employer must consider the exclusive representative's proposals, but a school employer is not bound to attempt in good faith to reach a negotiated written agreement." (*San Dieguito*, *supra*, at pp. 10-11.)

Finding that the duty to consult in good faith under section 3507 is similar to the duty to meet and confer under section 3505 does not deviate from PERB's precedent in *San Dieguito*. In fact, *San Dieguito* supports PERB's determination in this case. Like the definition of "consultation" contemplated in *San Dieguito*, the duty to meet and confer under section 3505 requires public agencies to meet with employee organizations to exchange information, opinions, and proposals. And PERB's decision did not state that under section 3507, the parties must, in good faith, reach an agreement that will become binding. Under PERB's decision, if the parties have consulted in good faith and attempted—but failed—to reach an agreement, the requirements of section 3507 would be satisfied.

In its reply brief, the City makes a strained argument that there ought to be a distinction between the meet and confer process contemplated in section 3505 and the good faith consultation process contemplated in section 3507, because under section 3505.7, if a meet and confer process fails to produce an agreement, a public

agency that is not required to proceed to interest arbitration may, after a public hearing regarding the impasse, implement its last, best, and final offer.

This argument ignores PERB's decision, which, as we noted earlier, states that the process mandated by section 3507 is "very much like" the process mandated by section 3505. Again, PERB did not state the two processes were *identical*. In its decision, PERB articulated that the process mandated by section 3507 required certain obligations in the conduct of consultation, which included an obligation to "endeavor to reach an agreement." PERB then expressly declined to consider questions that were not presented by the current case, such as "the extent to which disagreements unresolved during the consultation process are properly the subject of any dispute resolution processes established for treating collective bargaining disputes arising under MMBA section 3505 . . . ." Under the current process set forth under PERB's decision, the parties are not required to reach a binding agreement. Rather, the parties must merely endeavor to reach an agreement in the first instance.

Here, however, it is clear that the City failed to meet its obligation to consult in good faith. Even assuming that the consultation requirement *should* be markedly different than the meet and confer requirement, it, at the least, requires the parties to meet and discuss the issues. This minimal requirement would be in line with PERB's decision in *San Dieguito* and its interpretation of the duty to meet and consult under the EERA. (*San Dieguito*, *supra*, EERB Dec. No. 22E at p. 12, fn. 11.) It would also be in line with a literal interpretation of the statute's text, as the word "consultation" is defined as "[a] conference in which the parties consult and deliberate; a meeting for deliberation or discussion." (Oxford English Dict. Online (2016) <http://www.oed.com> [as of Nov. 23, 2016].) In this case, no meeting occurred at all, and the IAFF's ability to speak at the publicly noticed meeting is not an adequate "consultation" with the City. (See *Organization of Deputy Sheriffs v. County of San Mateo* (1975) 48 Cal.App.3d 331, 338

25

[consultation with employees before commission hearings found sufficient consultation in good faith under § 3507].)

Lastly, we are also not convinced by the City's argument that a different definition should apply, because under PERB's current interpretation if the parties reach an impasse on whether to proceed with the ballot measure repealing binding arbitration, the impasse would be submitted to binding arbitration. This hypothetical scenario is not before this court and was not before PERB.[7]

c. **Constitutional Issues**

Next, we find that PERB's interpretation of section 3507 does not violate the charter city home rule provisions of the California Constitution and the constitutional authority of the City Council to propose charter amendments to City voters.

"The California Constitution sets forth the home rule doctrine, which gives the chartered cities the power to ' "make and enforce all ordinances and regulations in respect to municipal affairs, subject only to [the] restrictions and limitations provided in their several charters . . . ." (Cal. Const., art. XI, § 5, subd. (a).)' " (*International Assn. of Firefighters*, *Local 230 v. City of San Jose* (2011) 195 Cal.App.4th 1179, 1197.)

---

[7] As noted before, PERB specifically acknowledged this in its decision, stating: "We leave for another day questions not presented here, for example, the extent to which disagreements unresolved during the consultation process are properly the subject of any dispute resolution processes established for treating collective bargaining disputes arising under MMBA section 3505 over wages, hours and other terms and conditions of employment." Additionally, as PERB points out in its respondent's brief, article V provided that binding arbitration was limited to "[a]ll disputes or controversies pertaining to wages, hours, or terms and conditions of employment which remain unresolved after good faith negotiations." The actual *provision* regarding binding arbitration is not a controversy involving wages, hours, or terms and conditions of employment. Rather, it is provision regarding the *procedure* to be used when resolving such disputes. Therefore, it seems unlikely that the City's fear that binding arbitration may itself become the subject of binding arbitration will come to fruition.

26

Article XI, section 5, subdivision (b) of the California Constitution provides that city voters have the "plenary authority" to provide in their city charters "the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

The California Supreme Court has considered the constitutionality of requirements to meet and confer with labor organizations in chartered counties and cities. In *Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, the court considered the constitutionality of the MMBA's requirement to meet and confer regarding layoff rules. There, the commission asserted that the meet and confer requirements of the MMBA irreconcilably conflicted with its charter requirement that it hold a public hearing before amending its rules, and that its unique status as an independent administrator of the merit system would be threatened if it was required to bargain. (*Id.* at p. 65.) The court held that the "meet-and-confer requirement can coexist with the charter-mandated hearing" (*ibid.*), and the commission's fear that its neutral status would be compromised was unfounded. The court concluded that it saw "no constitutional barrier to requiring the county here to meet and confer with employee representatives before amending civil service rules that govern layoff procedures." (*Id.* at p. 67.)

The California Supreme Court also considered and rejected a similar argument in *Seal Beach*, *supra*, 36 Cal.3d 591. In *Seal Beach*, the court held that there was "[n]o . . . conflict . . . between the city council's power to propose charter amendments and section 3505. Although that section encourages binding agreements resulting from the

27

parties' bargaining, the governing body of the agency—here the city council—retains the ultimate power to refuse an agreement and to make its own decision. [Citation.] This power preserves the council's rights under article XI, section 3, subdivision (b) [of the California Constitution]—it may still propose a charter amendment if the meet-and-confer process does not persuade it otherwise." (*Id*. at p. 601, fn. omitted.) The court also emphasized that "there is a clear distinction between the *substance* of a public employee labor issue and the *procedure* by which it is resolved. Thus there is no question that 'salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws.' [Citation.] Nevertheless, the process by which salaries are fixed is obviously a matter of statewide concern and none could, at this late stage, argue that a charter city need not meet and confer concerning its salary structure." (*Id*. at p. 600, fn. 11.)

Seal Beach dealt with the duty to meet and confer imposed by section 3505, not the duty to consult in good faith imposed by section 3507. Nonetheless, we see no reason why its reasoning should not apply here. Like the duty to meet and confer contemplated in section 3505, the duty to consult under section 3507 does not create a conflict with the charter city's power to propose charter amendments. Rather, it dictates the *procedure* by which certain rules related to employer-employee relations must be implemented. As articulated in *Seal Beach*, "[t]he law, however, is that a city's power to amend its charter can be subject to legislative regulation." (*Seal Beach*, *supra*, 36 Cal.3d at p. 598.) The City retains the authority to suggest a repeal of binding arbitration. And once it has, in good faith, consulted with those recognized employee organizations that have requested to meet, it can ultimately reject any suggestions made by the organizations and proceed to make its own decisions on the matter.

The City argues that *Seal Beach* should not apply, because the state's interest in a local agency's rules governing the procedural matters listed in section 3507 is minimal.

28

The City also insists that the intrusive nature of interest arbitration weighs against requiring the City to engage in the onerous task of engaging in a process comparable to meeting and conferring as described by section 3505 prior to submitting the ballot measure to voters.

In regard to the City's first argument, it appears that the City conflates the procedures by which a public employee labor issue is resolved and the actual substance of the issue. The state's interest in the *procedures* by which certain employer-employee related rules and regulations under section 3507 are enacted is comparable to the state's interest in the procedures by which labor disputes are resolved under section 3505. Moreover, as was stated in *Seal Beach*, there is no conflict between section 3505—and by logical extension, section 3507—and the city council's power to propose charter amendments.

The lack of any conflict between section 3507 and the City Council's power to propose charter amendments also undermines the City's argument that interest arbitration raises particular constitutional concerns because of its intrusive, unique nature. To support this argument, the City relies on *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278. *County of Riverside* noted there is a distinction between regulating labor relations and depriving the county of its authority to set employee salaries. (*Id*. at pp. 287-288.) It then concluded that a recently enacted bill requiring counties and other local agencies to submit to binding arbitration economic issues that arise during negotiations with unions representing firefighters or law enforcement officers violated provisions of the California constitution, because it deprived the county of its authority to provide for the compensation of its employees and delegated to the private body the power to interfere with county financial affairs and to perform a municipal function. (*Id*. at p. 282.)

29

Unlike *County of Riverside*, we are not considering the constitutionality of a binding arbitration ordinance or provision.  We are construing whether PERB's decision that binding arbitration is subject to the good faith consultation requirement set forth in section 3507 is constitutionally sound.  These are two completely different issues.  And we reiterate that section 3507 does not operate to curtail the City's power to propose charter amendments.  It also does not limit the City's power to reject or accept any proposal or agreement that may come out of the consultation process.  (*Seal Beach*, *supra*, 36 Cal.3d at p. 601.)  Compliance with section 3507 merely requires the City to, in good faith, consult with recognized labor organizations *before* deciding how the pertinent issue should be resolved.  In the context of this case, the City still retains the ultimate authority to determine if binding arbitration should be repealed.

### d.  **Undermining the Political Process**

The League argues that we should consider the undue burdens that may be placed on cities if PERB's decision is upheld.

First, since this issue was raised only by the League in its amicus curiae brief and not in appellant's opening brief, we decline to consider it.  (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co*., *supra*, 90 Cal.App.4th at p. 1161, fn. 6.)

Furthermore, even if we considered the issue on its merits, we would find that it fails.  Certainly, the process by which a city council decides to place a matter on an upcoming ballot can be a lengthy process, sometimes spanning months.  Under the Ralph M. Brown Act (§ 54950 et seq.) all city council actions must be made during publicly noticed city council meetings or council committees.  (§ 54950.)  Each meeting has its own set of procedural requirements, such as an advance notice and a publicly posted agenda.  (§ 54954.2, subd. (a).)  Additionally, Elections Code section 9255 provides that city councils may place certain charter amendments on the ballot only once every two years during established statewide general elections.  Under section 34458, the city

30

council must vote on whether to place the measure on the ballot at least 88 days before the election.[8]

The portions of the Elections Code and Government Code that pertain to the procedures through which cities may amend their charters do not provide for a particularly expedient process. Undoubtedly, adhering to a requirement that cities must also consult in good faith with recognized employee organizations under section 3507 adds an additional hurdle. It does not, however, render it impossible for cities to propose charter amendments that raise issues that are subjected to the duty to consult in good faith under the MMBA. And it does not justify ignoring the requirements of the MMBA.

As noted in *Seal Beach*, a city's power to amend its charter can be subjected to legislative regulation. (*Seal Beach*, *supra*, 36 Cal.3d at p. 598.) When discussing the requirement of a meet and confer imposed by section 3505 on a city's ability to propose charter amendments, the *Seal Beach* court described section 3505's burden on the city's democratic functions as "minimal." (*Seal Beach*, *supra*, at p. 599.) As previously noted, complying with the MMBA's requirements does not conflict with the city council's power to propose charter amendments. (See *Id*. at p. 601.) Therefore, the League's arguments pertaining to the alleged disruption in the political process caused by PERB's decision has no merit.

### e. **Retroactivity of PERB's Decision**

The City and the League argue PERB's conclusion that cities are required to consult over binding arbitration should not be retroactively applied, because it is a sea

---

[8] PERB has requested that this court take judicial notice of the legislative history of these statutes. We deny the request for judicial notice. Although the requested materials are proper subjects of judicial notice (Evid. Code, § 452), we do not believe the legislative history materials are relevant to our discussion (*id*., § 459; *People ex. rel. Lockyer v. Shamrock Foods Co*. (2000) 24 Cal.4th 415, 422, fn. 2).

change in the law the City could not have anticipated and would unfairly disenfranchise the City's voters.

" 'The general rule that judicial decisions are given retroactive effect is basic in our legal tradition.' [Citation.] Courts sometimes make an exception to this general rule when the decision changed a settled rule on which the parties had relied." (*Brennan v. Tremco, Inc*. (2001) 25 Cal.4th 310, 318.)

The City argues that PERB's decision effectively overturns numerous federal and state court decisions and PERB's own precedent. However, the precedents and rules that are cited by the City concern whether binding arbitration is a mandatory subject of bargaining under section 3505, *not* consultation under section 3507. (See *DiQuisto*, *supra*, 181 Cal.App.4th 236.) PERB's decision that binding arbitration is subject to the good faith consultation requirement of section 3507 does not represent a change in the law. There was no previously settled rule that binding arbitration is not a mandatory subject of consultation under section 3507.

The City also cites to cases where courts have been reluctant to invalidate votes of the electorate based on procedural irregularities. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 242-244 [finding that although initiative measure's title and summary were technically imprecise, they substantially complied with the law]; *Assembly v. Deukmejian* (1982) 30 Cal.3d 638.) PERB's decision, however, specifically clarified that its remedial authority did not extend to invalidating the results of the municipal election. That remedy lies exclusively with the courts in an action in quo warranto.[9] (*International Assn. of Fire Fighters v. City of Oakland* (1985) 174 Cal.App.3d 687, 698 [quo warranto writ is the exclusive method for

---

[9] We discuss PERB's remedy in greater detail in the last section of this opinion.

32

appellants to attack amendments to the city charter based on city's failure to comply with the MMBA].)

Based on the foregoing, we see no reason why PERB's decision should not be applied to the City under these circumstances.

### f. **PERB's Decision on Defenses Not Raised by the City**

In its decision, PERB held that absent a valid defense, a party subject to the MMBA's requirement to consult in good faith must defer action on matters subject to the consultation duty until the duty has been exhausted. Accordingly, the decision went on to consider—and reject—several possible defenses to the City's actions. The City argues that PERB should resolve, not find, issues; therefore, its additional analysis into these possible defenses, which were not briefed by either the City or the IAFF, was erroneous and deprived the City of due process and fairness as it was unable to prove these defenses before the ALJ and PERB.

First, we note that the City does not provide analysis or citations to legal authority for its assertion that PERB's decision on these defenses violates due process and the fundamental rules of fairness, aside to a lone citation to a PERB decision that states: "[t]he province of the board is to resolve, not to find, issues." (*Tahoe-Truckee Unified School Dist.* (1988) PERB Dec. No. 668 at p. 10 [12 PERC ¶ 19081].) When points are perfunctorily raised without adequate analysis and authority, we may treat them as abandoned or forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699.)

Additionally, even if we considered the argument we would find it has no merit. In *J. R. Norton Co. v. Agricultural Labor Relations Bd.* (1987) 192 Cal.App.3d 874, the Agricultural Labor Relations Board (ALRB) concluded that the employer violated the law when it refused to rehire members of a crew that were laid off, even though the original complaint charged the employer with violating the law by laying off the crew in

33

the first instance. (*Id*. at pp. 886-887.) The appellate court held that the employer was not advised that failing to rehire members was the activity it needed to defend itself against, and the lack of notice violated the principles of procedural due process and required the ALRB's findings to be set aside. (*Id*. at p. 888.)

In contrast to *J. R. Norton*, the unfair practice complaint here charged the City with violating section 3507 when it failed to consult in good faith with the IAFF over the proposed resolution. The issue—whether the City violated section 3507—was plainly presented to the City. The City chose to focus on arguing that section 3507 did not require it to meet with the IAFF, and even if it did, the IAFF waived its right to consult. However, if a valid defense existed for the City Council's failure to comply with section 3507 before it voted to place on the ballot the measure to repeal article V, then the City did not violate the MMBA and the unfair practice charge would be unfounded. Therefore, the issue of whether any valid defense existed for the City's acts was encompassed within the broader issue of whether the City violated the MMBA. It was necessary for PERB to address the possible defenses in order to correctly decide if the City violated the MMBA. And it was not, like the new issue contemplated in *J. R. Norton*, an issue that the City lacked notice of.

3. *PERB's Conclusion Regarding Waiver and IAFF's Request to Consult*

In its decision, PERB concluded the IAFF did not waive its right to meet and consult with the City. This factual determination deviated from the finding made by the ALJ. We find that based on a review of the record, PERB's conclusion regarding waiver is supported by substantial evidence. Accordingly, it must be upheld.

a. **Sufficient Evidence of IAFF's Timely Request to Consult**

The City focuses its attention on the IAFF's lack of action in the weeks before the July 18, 2011 meeting. The City points out that between June 20 and July 18, 2011, the IAFF did not formally request to consult with the City over the proposed ballot measure.

34

This argument ignores the IAFF's previous attempts to request a consultation with the City over the proposed changes to article V. In July 2010, the IAFF specifically stated—in writing—that it wished to consult with the City and asked the City to comply with the requirements of the MMBA. The City claims the ballot measure contemplated in 2010 was never adopted by the City Council, and there is no authority for the proposition that the request to bargain remains valid for an indefinite period of time. Yet, the City itself does not provide any support for its claim that a request for bargaining has, in essence, an expiration date.

The City's argument that this earlier request to bargain somehow expired also assumes the City Council's consideration of whether to repeal or amend the binding arbitration provision in article V in 2010 and in 2011 were two separate processes. There is ample evidence to the contrary. In August 2010, the City Council decided to direct its staff to return in the fall with ideas and a timeline for considering changes to binding arbitration after engaging in further study and outreach. In May 2011, City staff prepared a report with information about the proposal to repeal the interest arbitration measure. And in July 2011, the city attorney prepared a report on binding arbitration, referencing the City Council and committee deliberations that began in August 2010 when the City Council considered placing the measure on the November 2010 ballot. In sum, it appears that the City began considering modifying or repealing the binding arbitration provision in article V in 2010 and its consideration of the possible changes continued through 2011.

Additionally, during a City Council meeting in June 2011, a City councilmember declared to the other members that he understood that the IAFF desired to negotiate with the City over binding arbitration. That same councilmember then opined that instead of negotiating, the IAFF should be limited to participating by addressing the City Council during public meetings. Furthermore, the IAFF expressly made a second request to meet and consult during the July 18, 2011 meeting. These requests were sufficient to place the

35

City on notice of the subject over which discussions are sought—provisions regarding interest arbitration. (*Newman-Crows Landing Unified School Dist*. (1982) PERB Dec. No. 223E [6 PERC ¶ 13162] (*Newman-Crows*).)

Citing to *San Diego Adult Educators v*. *Public Employment Relations Bd*. (1990) 223 Cal.App.3d 1124, the City notes that "[w]hen a union official with authority to act has actual notice of the intended change, together with adequate time to decide whether to demand negotiation before a final decision is made, the union will be deemed to have received adequate notice." (*Id*. at p. 1136.) As a parallel, the City therefore argues that the councilmember's statement during the June 2011 hearing that he understood that the IAFF desired to negotiate was insufficient, because he was not the City's authorized labor negotiator. Absent evidence showing how the councilmember came to this understanding, the City argues it cannot be determined whether the entire City Council was aware of the IAFF's desire to negotiate. The City also characterizes the councilmember's statement as hearsay, because he did not testify during the PERB hearing.

We find that even if we were to disregard the evidence that the councilmember stated during the City Council meeting that the IAFF wished to bargain, there was still substantial evidence supporting PERB's conclusion that the City Council was notified of the IAFF's desire to negotiate. As we noted before, the IAFF made it clear to the City as early as 2010 that it desired to meet with the City to discuss binding arbitration provision. And the request was reiterated again by the IAFF in July 2011 during the City Council meeting. The City continually failed to address the IAFF's requests, and indeed several times rejected the notion that a meeting with the IAFF was required under the MMBA over repealing binding arbitration.

The ALJ's proposed decision initially found that the IAFF had waived its right to negotiate, because its request in July 2011 to meet and consult with the City was

36

untimely. PERB overturned this decision. We find that PERB did not err. " ' "Courts examine the defense of waiver carefully in order to ensure the protection of a party's rights, especially when these rights are statutorily based." ' [Citations.] Federal courts use two basic tests when considering claims that a union has waived its right to bargain with an employer: some follow the rule that a waiver must be made in 'clear and unmistakable' language [citations], and others look beyond the language of the contract and consider the 'totality of the circumstances' to determine whether there was a waiver of rights [citations]. In California, the 'clear and unmistakable' language test has been preferred in cases involving public employees." (*Building Material & Construction Teamsters' Union v. Farrell*, *supra*, 41 Cal.3d at pp. 667-668.)

A labor organization can waive its right to bargain if it fails to make a timely request. In *Stockton Police Officers' Assn. v. City of Stockton* (1988) 206 Cal.App.3d 62 (*Stockton Police Officers' Assn.*), the police union was found to have waived its right to meet and confer under section 3505 over the City of Stockton's decision to change to a different type of psychological counseling service. There, the City of Stockton advised the police union about the city's desire to move to a different type of counseling service and solicited input from the police union through a letter, requesting a response by a specified date. Several months later, the City of Stockton approved the contract for counseling services. (*Stockton Police Officers' Assn.*, *supra*, at p. 64.) Several months after that, the police union formally requested a meet and confer session concerning the new contract. (*Id.* at p. 65.) The police union argued that it had not received the city's letter until after the requested response date. (*Id.* at p. 66.) Nonetheless, the union acknowledged that it had received the letter before the city council held a hearing on the matter, before the new contract was approved. (*Ibid.*) The appellate court found that this late request was untimely. (*Id.* at p. 67.)

Based on its actions, the IAFF did not clearly and unmistakably waive its right to negotiate over binding arbitration. Unlike the situation contemplated in *Stockton Police Officers' Assn.*, the IAFF made at least two clear requests to negotiate with the City about binding arbitration *before* the measure was passed, once in 2010 and again during the meeting on June 18, 2011. This does not unequivocally reflect that the IAFF chose to waive its rights. Nor was the later request, made on June 18, 2011, so untimely as to render it a waiver. The final time the IAFF expressly requested to meet, there was still nearly three weeks before the City's August 12, 2011 deadline to submit the measure to the registrar's office. Each time the IAFF requested and made known its desire to negotiate, the City did not respond and continued to deny that there was any obligation under the MMBA to bargain. Thus, there is sufficient evidence to support PERB's determination that there was no waiver.

In its opening brief, the City also notes that the IAFF was regularly meeting with the City to bargain over other matters during the same time period. During these meetings, the IAFF did not request to bargain over the charter amendment. As pointed out by the IAFF, requesting to bargain over binding arbitration during these meetings would have been inappropriate. The scope of those bargaining sessions, which were sought under section 3505, was limited to certain matters that had been declared to be at an impasse in February 2011 after certain negotiations with the IAFF. And as we previously determined, the scope of representation under section 3505 is different than the scope of representation under section 3507.

Lastly, the City maintains that Spitaleri testified during the PERB hearing that he deliberately waited until the City Council made a decision regarding binding arbitration before he requested to bargain. The City cites to a statement made by Spitaleri during the PERB hearing in response to a question about why he did not make suggestions or proposals to the City regarding the language of the proposed ballot

38

measure. After reviewing the transcript of the PERB hearing, we believe the City misconstrues Spitaleri's statement. In response to the posed question, Spitaleri stated: "Because the actual language, if I remember right, was not adopted. It was still in the making. And we didn't know what they were going to do." In context, Spitaleri was explaining that he did not offer proposals to the City at the time, because he was unsure of what course of action the City was going to take. Spitaleri's statement did not indicate that he engaged in gamesmanship with the City to avoid requesting to bargain until the City had decided what steps it was going to take.

### b. **PERB did not Shift the Burden of Requesting Consultation to the Employer**

The City and the League opine that PERB's decision goes against decades of established law and articulates a new rule that an employer bears the burden to seek out a labor organization to negotiate if the employer is aware of the labor organization's desire to bargain. The League argues that the labor organization must make an affirmative request. We do not believe PERB's decision goes against the established rule that a labor organization must make an affirmative request to consult.

In its decision, PERB cited to *Newman-Crows*, *supra*, PERB Dec. No. 223E, for the principle that the party seeking to meet and confer must initiate the process by making a request to meet. The request need not be stated in particular terms, but it must place the responding party on notice regarding which subjects are sought to be discussed.

In part, *Newman-Crows* cited to *Schreiber Freight Lines* (1973) 204 NLRB 1162 (*Schreiber*). In *Schreiber*, the National Labor Relations Board affirmed an administrative law judge's decision, noting that "the inquiry as to weather a proper request has been made need not be confined to communications between the parties; for, the Board has also stated that the requirement is met where 'it is clear from the entire situation that all essential elements of a valid demand are present.' [¶] . . . it is apparent that the test of

39

whether a proper request has been made was not designed to invite meaningless 'game playing,' but merely to avoid a finding of a refusal to bargain against an employer 'without some indication given to him by [employees] or their representatives of their desire or willingness to bargain.' In sum, where the employer is aware, through direct or indirect means, of an intention to bargain by the employee representative, the inquiry is ended." (*Id*. at p. 1168.) "[T]he determination as to whether a particular communication constitutes a proper request to negotiate is a question of fact to be determined on a case-by-case basis." (*Delano Joint Union High School Dist*. (1983) PERB Dec. No. 307E at p. 7 [7 PERC ¶ 14146].)

In its decision, PERB followed *Schreiber*'s reasoning and determined it was the employer's awareness of a labor organization's desire to bargain that was crucial. Additionally, the words chosen by the labor organization are not important, so long as it is effectively conveyed to the responding party that the organization desires to negotiate.

We do not find that PERB's interpretation regarding the requirements underlying a request to negotiate is clearly erroneous. In fact, it appears that PERB's decision is in accord with its prior decisions. PERB's decision does not shift the burden to the responding party to initiate a negotiation. Rather, PERB is merely reiterating that the labor organization—here the IAFF—must in some way effectively convey to the responding party (the City in this case) that it desires to negotiate. Additionally, the particular language that is required in order to request a negotiation is not vital. The decision still makes clear that the labor organization bears the duty of effecting such communication to the public agency.

### c. **PERB's Decision does not Require Clarification**

Next, the City argues PERB erred when it held that "[w]here an employer believes that the subject over which an employee organization desires to meet and confer exceeds the employer's duty to meet and confer, or an employer is otherwise in doubt as to its

40

meet and confer obligation, the employer must seek clarification." The City argues that PERB mischaracterized its prior decisions when coming to this conclusion, and the statement by PERB requires the City to seek clarification from labor organizations on subjects that it believes clearly fall outside the purview of the scope of the duty to meet and confer under the MMBA. We disagree with the City that PERB's statement on this point is erroneous.

"[O]ne of the issues we consider on review is whether PERB followed its own precedents in reaching its decision." (*California Teachers Assn. v. Public Employment Relations Bd.*, *supra*, 169 Cal.App.4th at p. 1087.)

In its decision, PERB cited to several of its other decisions to support the principle articulated above. In *Healdsburg Union High School Dist./San Mateo City School Dist.* (1984) PERB Dec. No. 375 at pages 9-10 [8 PERC ¶ 15021] (*Healdsburg*), PERB concluded that when there is an ambiguous or vague proposal that may or may not come within the scope of representation, the objecting party must seek clarification of questionable proposals. Failure to seek clarification of questionable proposals is a violation of the duty to negotiate in good faith. Thus, *Healdsburg* held that if a proposal is *arguably* negotiable in whole or in part, clarification was required. PERB further noted that "[t]he process of clarification does not compel the employer to engage in substantive negotiations on any subject not mandated by the Legislature." (*Id.* at p. 10.)

PERB also cited to *Rio Hondo Community College Dist.* (2013) PERB Dec. No. 2313E at page 13 (*Rio Hondo*), PERB concluded that "[i]f the employer refuses to bargain without seeking clarification of the union's negotiability rationale, it fails to meet and negotiate in good faith." In *Rio Hondo*, the union sent a school district a letter requesting to bargain over effects of a decision to install cameras on discipline and evaluation procedures. (*Id.* at p. 8.) The district responded that it would not negotiate, and the record did not show that the district made any attempt at seeking clarification

41

from the union about how the subject fell within the scope of representation. The district argued that its refusal to negotiate was lawful, because the letter did not identify negotiable areas of impact and failed to identify the effects of installing the cameras except for the use of evaluating it for disciplining employees, which was nonnegotiable. (*Id*. at pp. 8-9.) PERB rejected this argument.

In its decision in *Rio Hondo*, PERB laid out three options for a employer to take when receiving a union's bargaining demand: "(1) accede to the demand and address the union's concerns in negotiations; (2) ask the union for its negotiation justification, viz., seek clarification of (a) the areas of impact proposed for negotiation and (b) whether these areas of impact are within the scope of representation; or (3) refuse the union's demand. In choosing the third option, the employer does so at its peril if its refusal is later determined to be unjustified." (*Rio Hondo*, *supra*, PERB Dec. No. 2313E at pp. 9-10.) *Rio Hondo* cited to *Healdsburg* and set forth that the proper place to clarify bargaining demands was at the bargaining table itself. (*Id*. at p. 12.) And if following a clarification the employer is assured that the union's negotiability rationale is faulty, the employer can refuse to negotiate, having satisfied its duty to clarify under *Healdsburg*. (*Id*. at pp. 12-13.)

The other decisions cited by PERB are similar. (*Kern Community College Dist*. (1983) PERB Dec. No. 337E at p. 6 [7 PERC ¶ 14229] ["if the District was unsure as to the object of the Association's requests, the duty to bargain in good faith behooved it as a minimum to seek clarification of the Association's position"]; *Jefferson School Dist*. (1980) PERB Dec. No. 133E at p. 11 [4 PERC ¶ 11117] ["the hearing officer's instruction requires the employer receiving a proposal to make a good-faith effort to seek clarification of questionable terms and proposals, to voice its reasons for believing that a proposal is outside scope, and to enter into negotiations on those aspects of proposals which it finally views as covered . . ."].)

42

Recent PERB decisions have also summarized the same principle set forth by PERB in its present decision. In *County of Santa Clara* (2013) PERB Dec. No. 2321M, PERB cited to *Healdsburg* and noted that a "party objecting that a proposal is beyond scope of representation must make good faith effort at clarification by voicing its specific reasons for believing proposal is outside the scope of representation and entering into negotiations on those aspects of proposal which, after clarification, it views as negotiable." (*Id.* at pp. 31-32.)

Based on the foregoing, we do not believe PERB failed to follow its own precedents when coming to its conclusion here. As in *Rio Hondo*, where the district believed the union sought to negotiate over a non-negotiable subject, here the City had a duty, as explained in *Healdsburg* and the other cases cited above, to voice reasons for why it believed binding arbitration was outside the scope of representation. As articulated in *Healdsburg*, the objecting party need not "wrestle to a fall with every ambiguity, or search out every negotiable or objectionable word or phrase." (*Healdsburg*, *supra*, PERB Dec. No. 375 at p. 10.) And as stated in *Rio Hondo*, the employer may ultimately refuse to negotiate following clarification. It may also avoid clarification entirely, except it does so at its own peril if its refusal is later deemed to be a violation of the MMBA. (*Rio Hondo*, *supra*, PERB Dec. No. 2313E at p. 12.)

We note that in this particular case, PERB concluded the City was required to meet and consult with the union over the ballot measure repealing binding arbitration. Therefore, it was *not* the City's failure to seek clarification that rendered the City's acts unlawful. Rather, the basis of PERB's decision was the City's failure to meet and consult over a matter that fell within the scope of representation under the MMBA.

4. *Remedy*

In its decision, PERB explained that it did not believe it had the remedial authority to order the results of the municipal election to be overturned. That remedy lies

43

exclusively with the courts. (*International Assn. of Fire Fighters v. City of Oakland*, *supra*, 174 Cal.App.3d at p. 698 [quo warranto writ is the exclusive method for appellants to attack amendments to the city charter based on city's failure to comply with the MMBA].) PERB, however, directed the City Council to rescind its July 18, 2011 resolution referring to voters the ballot measure repealing binding arbitration. PERB also ordered the City to cease and desist from further unlawful conduct and post a notice incorporating the terms of the order at all work locations where notices to unit employees are customarily posted.

The City argues that PERB lacks the authority to direct the City Council to rescind its prior resolution. As we explain below, we agree. However, we find that PERB does possess the requisite authority to invalidate a resolution that violates the MMBA.[10]

### a. **PERB's Broad Remedial Authority**

Section 3509 grants PERB broad remedial authority. "The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purpose of this chapter, shall be a matter within the exclusive jurisdiction of [PERB] . . . ." (§ 3509, subd. (b).) In prior decisions, PERB has restored the parties to the status quo as a remedy. (*California State*, *supra*, 51 Cal.App.4th at p. 946.)

### b. **Doctrine of Separation of Powers Bars PERB from Ordering the City Council to Rescind a Resolution**

PERB and the IAFF opine that PERB's order directing the City Council to rescind its July 18, 2011 resolution is not beyond its authority. Rather, PERB argues that this order is within the purview of its broad remedial authorities and merely restores the parties to the status quo before the resolution was passed in violation of the procedures

---

[10] We requested the City and PERB to submit supplemental briefs addressing these two issues.

44

set forth in the MMBA.  The City disagrees; it argues that directing the City Council to rescind its prior resolution, a legislative act, is in itself a legislative act that PERB cannot compel.  We agree with the City.

"Generally, a court is without power to interfere with purely legislative action, in the sense that it may not command or prohibit legislative acts, whether the act contemplated or done be at the state level [citation] or the local level [citation].  The reason for this is a fundamental one—it would violate the basic constitutional concept of the separation of powers among the three coequal branches of the government."  (*Monarch Cablevision*, *Inc*. *v*. *City Council* (1966) 239 Cal.App.2d 206, 211; *Board of Supervisors v*. *California Highway Commission* (1976) 57 Cal.App.3d 952, 961-962.)  Similarly, PERB—acting as a quasi-judicial agency—cannot compel legislative action without violating the separation of powers doctrine.  (*City and County of San Francisco v*. *International Union of Operating Engineers*, *Local 39* (2007) 151 Cal.App.4th 938, 943 ["PERB is an expert, quasi-judicial administrative agency."].)

PERB argues that given its broad discretion to fashion remedies, it has the authority to order the City Council to rescind its resolution referring the ballot measure to the voters.  PERB cites to *Vernon*, *supra*, 107 Cal.App.3d 802.  In *Vernon*, the appellate court held that an anti-carwash rule implemented by the City of Vernon was adopted in violation of the MMBA.  The appellate court noted that "California courts have adopted the private sector view that unilateral action constitutes a per se violation of the MMBA, and must therefore be set aside until the 'meet and confer in good faith' duty has been met by the employer."  (*Id*. at p. 824.)  The appellate court then affirmed, in part, a peremptory writ requiring that the City set aside and rescind certain actions, because they were the "result of unilateral actions undertaken by the City" that were void for procedural violations of the MMBA.  (*Ibid*.)  In its discussion, the court held that "[T]he rule, being unilaterally adopted by the City without prior notice to or meeting and

45

conferring with the Union, was void in its entirety for procedural violation of Government Code section 3505." (*Id*. at p. 828.)

*Vernon*, however, did not discuss the separation of powers doctrine. And although the *Vernon* court affirmed in part the issuance of the writ requiring the City set aside and rescind certain actions, the court also stated in its discussion that it was holding that the actions taken by the City were void due to the procedural violations of the MMBA. (*Vernon*, *supra*, 107 Cal.App.3d at p. 824.) *Vernon* was silent on the differences between rescinding and invalidating (voiding) a legislative action. We believe there is a difference between the two. Ordering a legislative body to enact or rescind legislation is a different remedy than declaring that a legislative act is void or invalid.

PERB and the IAFF argue that *El Dorado County Deputy Sheriff's Assn. v. County of El Dorado* (2016) 244 Cal.App.4th 950, 962 (*El Dorado*) is instructive. In *El Dorado*, the County created a new classification for employees providing court perimeter security and placed the new classification in a general bargaining unit. At the same time, the county deleted several positions from the law-enforcement bargaining unit. (*Id*. at p. 953.) The El Dorado County Deputy Sheriff's Association petitioned for a writ of mandate with the trial court, arguing that the county violated its duty to meet and confer. The association also argued that the county violated its local rules when it deleted positions in the law-enforcement bargaining unit without giving notice to and consulting with the association. (*Id*. at p. 960.) In part, the *El Dorado* court concluded that the county violated its own rules (which in itself was a violation of the MMBA) when it failed to meet with the association over the deleted positions. (*Id*. at p. 962.)

The *El Dorado* court then turned to examine the appropriate remedy. The association argued that the court must invalidate the resolutions, which would have the effect of directing the county to restore the deleted positions. (*El Dorado*, *supra*, 244 Cal.App.4th at p. 962.) The county argued that the court could not order such a remedy,

46

because it would either violate the separation of powers doctrine or interfere with the county's management rights. (*Ibid*.) The separation of powers argument was premised on the fact that restoring the deleted positions would affect the county budget. The *El Dorado* court rejected the county's separation of powers argument. (*Id*. at p. 963.) It held that the "commonsense, legally supportable remedy is to invalidate the action that violated the local rule—deletion of the law-enforcement bargaining unit positions—and direct the County to proceed according to law." (*Ibid*.)

In its decision, *El Dorado* distinguished itself from *County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693. In *County of Butte*, a county board of supervisors reduced the sheriff's budget, eliminating many deputy positions. In order to halt the proposed staffing reductions, the sheriff sued the county. (*Id*. at pp. 695-696.) In part, the sheriff prayed for the trial court to issue a writ directing the board to rescind the layoff notices and provide the necessary funding to the employees in the sheriff's department. (*Id*. at p. 696.) *County of Butte* noted that the county's adoption of the budget was a legislative function and under the separation of powers doctrine, a court is without power to interfere in that process. (*Id*. at p. 698.) The *El Dorado* court concluded that unlike the situation contemplated in *County of Butte*, it was "not attempting to dictate legislation but instead [was] merely enforcing the manner in which the County is permitted (by its own rules, in this instance) to legislate." (*El Dorado*, *supra*, 244 Cal.App.4th at p. 963.) The *El Dorado* court distinguished its decision as being "concerned with whether the County proceeds according to law," not with making "legislative determinations for the county." (*Ibid*.)

We disagree with PERB to the extent it argues that *El Dorado* can be interpreted to hold that a quasi-judicial agency like PERB has the power to order a legislative body to rescind a legislative act or affirmatively pass legislative acts. Such a principle is in direct contradiction to the separation of powers doctrine. (*Mandel v. Myers* (1981) 29

47

Cal.3d 531, 551, fn. 9 ["[B]y virtue of the separation of powers doctrine courts lack the power to order the Legislature to pass a prescribed legislative act"]; *Sklar v. Franchise Tax Board* (1986) 185 Cal.App.3d 616, 624 [" '[m]andamus will not lie to compel a legislative body to perform legislative acts in a particular manner.' "].)  And we do not believe PERB's characterization of *El Dorado* is accurate.  In *El Dorado*, the court did not direct the county to take legislative action.  As stated in its discussion of the issue, the *El Dorado* court ordered that the county's acts, taken in violation of the MMBA and its own rules, be invalidated.  (*El Dorado*, *supra*, 244 Cal.App.4th at p. 965.)  Invalidating the county's acts, which would have the effect of requiring the county to restore the deleted positions, was not dictating legislation but was "merely enforcing the manner in which the County is permitted (by its own rules, in this instance) to legislate."  (*Id.* at p. 963.)  In other words, the *El Dorado* court invalidated the county's acts and then ordered the county "to proceed according to law and consistent with [the] opinion" in *El Dorado*.  (*Id.* at p. 965.)

PERB argues the separation of powers doctrine is not violated with its order directing the City Council to rescind the resolution, because, like in *El Dorado*, it is not directing the City Council to enact particular legislation.  Rather, it is requiring the City Council to rescind a legislative action taken in violation of the MMBA.  This argument lacks merit.  If a passed resolution is legislative in nature, it necessarily follows that rescinding the resolution is similarly legislative in nature.  (See *Hilton v. Board of Supervisors* (1970) 7 Cal.App.3d 708, 714 ["[S]ince the passage of a zoning ordinance is a legislative act, it necessarily follows that the vacating of such an enactment (the relief here sought) is likewise legislative in character."]; *Eller Outdoor Advertising Co. v. Board of Supervisors* (1979) 89 Cal.App.3d 76, 83 ["[W]e think rescinding the resolution is a legislative act beyond the court's power to command, and therefore violative of the doctrine of separation of powers."].)

48

*San Leandro Police Officers Assn. v. City of San Leandro* (1976) 55 Cal.App.3d 553, 558, also relied on by PERB, is not instructive. In *San Leandro*, several labor organizations and employees sought a writ of mandate compelling the city council to enact an ordinance granting them certain benefits. (*Id*. at p. 555.) The appellate court concluded the city council's acts had violated the MMBA. It noted that "[a]lthough the judgment calls for the city council to adopt certain legislation, it does not direct the city council to exercise its discretion in any particular manner. The judgment and writ must be understood as leaving it open to the city council to eliminate the discrimination by any lawful means. The city council remains free to extend or eliminate the management incentive program, but it may not discriminate among its employees for exercising their rights under the [MMBA]. It was proper to compel by means of a writ of mandate action to correct the existing unlawful practice." (*Id*. at p. 558.)

*San Leandro* relied on *Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328 (*Glendale*). In *Glendale*, city employees negotiated a memorandum of understanding that was passed by the city council. In part, the memorandum of understanding contained a survey provision that required the parties to conduct a joint salary survey of other jurisdictions, the intent of the survey being that Glendale salaries would be above the averages in these jurisdictions taking into consideration internal alignments and other considerations. (*Id*. at p. 332.) The city council thereafter passed a salary ordinance that went against the memorandum of understanding, setting salaries that were below average compared to the other jurisdictions. (*Id*. at p. 333.) The appellate court held that the ordinance did not comport with the memorandum of understanding and violated the city's duty under the MMBA. It therefore concluded that mandamus should issue to direct the city to compute and pay compensation to city employees using the formula set forth in the appellate opinion, and

49

directed that retroactive salaries and wages should be paid to the employees' attorneys as attorney fees. (*Id*. at pp. 333-334.)

On a petition for review to the California Supreme Court, one of the arguments advanced by the *Glendale* defendants was that mandamus could not lie to enforce the memorandum of understanding. (*Glendale*, *supra*, 15 Cal.3d at p. 343.) The defendants argued that the adoption of a salary ordinance was a legislative act, and a mandamus could not compel a legislative action. (*Ibid*.) The Supreme Court rejected this claim, noting that it was conceived based on the mistaken assumption that the trial court's judgment had mandated the city to enact a new salary ordinance. (*Id*. at p. 344.) Rather, the city's approval of the memorandum of understanding was itself the legislative act that fixed employee salaries. Therefore, the writ did not require the enactment of a new ordinance fixing salaries—which would be a legislative act. Instead, the writ "directed the non-legislative and ministerial acts of computing and paying the salaries as fixed by the memorandum and judgment. The use of mandamus in the present case thus falls within the established principle that mandamus may issue to compel the performance of a ministerial duty or to correct an abuse of discretion." (*Ibid*., fns. omitted.)

We believe *San Leandro* misread *Glendale*. As described above, *Glendale* did not hold that a writ of mandate can compel a legislative body to enact legislation. *San Leandro*'s conclusion that such mandamus could lie is therefore suspect, and we respectfully disagree with its holding. Additionally, it is important to note that the writ of mandate contemplated in *Glendale* did not—as specifically stated by the *Glendale* court—force legislative action. Rather, *Glendale* expressly stated that it was upholding the appellate court's judgment, because it considered the calculation of salaries in accordance with the memorandum of understanding to be a *ministerial* act, not a legislative one.

50

PERB cites to *City Council v. Superior Court* [(*Santa Barbara County*)] (1960) 179 Cal.App.2d 389 (*Santa Barbara County*), which we do not believe is dispositive. There, the appellate court concluded that it could not compel the city to raise rates for trash collection, which was a legislative act. (*Id.* at pp. 391, 394-395.) The court noted that most cases which upheld interfering with legislative acts are "directed toward the right to undo what the legislative or quasi legislative body has done, not toward directing it to perform an act which is prospective in operation." (*Id.* at p. 394.) *Santa Barbara County*, however, did not explain what it meant by the "right to undo" what the legislative body has done. (*Ibid.*) The court did not expressly state that the right to undo what the legislative body has done somehow encompasses the right to *direct* the legislative body to take legislative action to rescind or vacate its prior act.

Additionally, "undoing" the erroneously passed legislation can be accomplished by means that are not offensive to the separation of powers doctrine. (See *City and County of San Francisco v. Cooper* (1975) 13 Cal.3d 898, 916 ["in the absence of some overriding constitutional, statutory or charter proscription, the judiciary has no authority to invalidate duly enacted legislation"].) For example, a judicial body could declare legislation void and invalidate it, as was done in *El Dorado*, *supra*, 244 Cal.App.4th at page 963.[11] Similar action was taken in *Bowles v. Antonetti* (1966) 241 Cal.App.2d 283, where the appellate court considered whether a writ of mandate could compel the city council to annul its resolution vacating a street, which was a legislative act. In *Bowles*, the appellate court cited to *Santa Barbara County*, *supra*, 179 Cal.App.2d at page 394 for the proposition that if a city council takes action that is fraudulent, or unreasonable and arbitrary so as to constitute an abuse of discretion, courts may interfere with legislative

---

[11] We also asked the parties to submit supplemental briefs addressing the issue of whether PERB possesses the authority to invalidate a legislate act like the resolution referring the measure to repeal article V to the voters.

action. (*Bowles v. Antonetti*, *supra*, at pp. 286-287.) The court held that "[u]ndoing what the legislative body has done may be accomplished by a judgment declaring the legislative act void." (*Id*. at p. 286.) In contrast, issuing a mandate compelling the city council to annul its resolution required the city council to perform legislative acts— including passing a resolution annulling its previous resolution. Therefore, if issued, the writ of mandate would compel the city council to perform legislative acts, which it cannot do. (*Ibid*.)

We note that multiple other courts have, in the past, declared legislatively passed ordinances or acts to be void due to procedural defects. (*El Dorado*, *supra*, 244 Cal.App.4th at p. 963 [invalidating county's act that violated local rule]; *Vernon*, *supra*, 107 Cal.App.3d 802 [rule that was unilaterally adopted without prior notice to or meeting and conferring with labor organization was void for its procedural violation of § 3505]; see *Williams v. City of San Bruno* (1963) 217 Cal.App.2d 480 [affirming trial court's decision that zoning ordinance was void due to the city's failure to comply with former Gov. Code, § 65653]; *Schofield v. City of Los Angeles* (1932) 120 Cal.App. 240 [ordinance passed without submission to city planning commissioners declared void].)[12] We believe that such a remedy may be proper in circumstances similar to the ones presented here.

Lastly, PERB's reliance on its prior decisions ordering cities and city councils to rescind rules found to be in conflict with the MMBA is also unavailing. For example, in its supplemental brief, PERB cites to *County of Imperial* (2007) PERB Dec. No. 1916M [31 PERC ¶ 120], where it considered the validity of a county's employer-employee

---

[12] As we noted earlier, *Vernon* involved a peremptory writ that, in part, ordered the city to rescind certain actions. (*Vernon*, *supra*, 107 Cal.App.3d at p. 806.) The doctrine of separation of powers was not addressed in *Vernon*. Furthermore, in its analysis the court reiterated that it found the resolution to be *void* since it was not passed in compliance with section 3505. (*Vernon*, *supra*, at p. 828.)

relations policy that was adopted as a local rule by the county's board of supervisors. There, PERB held that the provision was contradictory to and prohibited under the MMBA. (*Id*. at p. 22.) It then ordered the county and its governing board and representatives to rescind the rule. (*Id*. at p. 23.) The fact that PERB has, in its prior decisions, ordered governing bodies to undertake what appears to be legislative action, does not validate its current order. *County of Imperial* did not consider the applicability of the separation of powers doctrine. And as noted, we have concluded that ordering rescission of a legislative act is in itself a legislative act. The separation of powers doctrine prohibits this remedy.

Thus, we conclude that PERB lacks the authority to compel the City Council to legislate. Its order directing the City Council to rescind its prior legislative act was therefore improper.

### c. **Effectiveness of PERB's Remedy**

The City argues that PERB lacks authority to issue an effective remedy, because the exclusive process for challenging charter amendments is an action in quo warranto under Code of Civil Procedure section 803. "An action in the nature of quo warranto is derived from the common law writ used in England by the King's Attorney General to test the validity of franchises or claims asserted by subjects of the crown. [Citations.] Today, relief traditionally granted by the writ, such as a challenge based on purported irregularities in the legislative process of a charter amendment which has taken effect, must be accomplished through the command of section 803." (*Pulskamp v. Martinez* (1992) 2 Cal.App.4th 854, 859 (*Pulskamp*).) Accordingly, the City argues that PERB's decision is simply advisory in nature.

We disagree and find *Pulskamp* to be instructive. In *Pulskamp*, the mayor of Los Angeles inadvertently signed an ordinance passed by the city council authorizing a special election to amend the Los Angeles city charter. (*Pulskamp*, *supra*, 2 Cal.App.4th

at p. 856.)  The mayor discovered his error and vetoed the legislation.  Despite the veto, the city clerk announced that he intended to place the proposed amendment on the ballot for the upcoming election.  The mayor, along with a taxpayer, sought a writ of mandate with the superior court seeking to stop the city clerk from placing the referendum on the ballot.  (*Id*. at pp. 856-857.)  The trial court denied the petition, and the referendum was passed by voters.  (*Id*. at p. 857.)

*Pulskamp* noted that "when an action in quo warranto is not available, a private citizen may proceed to seek relief by other means."  (*Pulskamp*, *supra*, 2 Cal.App.4th at p. 859.)  At the time the petitioners sought the writ of mandate, a quo warranto action would not have been proper.  The charter amendment had not yet been passed.  The petitioners' sole remedy, fixed by the facts existing at the time they commenced the action below, was a writ of mandate with the superior court.  (*Id*. at p. 860.)  Therefore, the petitioners had standing to appeal the trial court's denial of the petition for a writ of mandate.  (*Ibid*.)

At the time the IAFF filed its unfair practice complaint with PERB, an action in quo warranto was not yet available.  The election had not occurred and the charter had not yet been amended.  The IAFF could not have filed an action in superior court.  Furthermore, under section 3509, subdivision (b), the initial determination of whether an unfair practice charge under the MMBA is justified is within PERB's exclusive jurisdiction.  The IAFF properly filed its unfair practice complaint against the City with PERB.

Additionally, a declaration that the City Council's resolution is void effectively returns the parties to the status quo ante.  (*Bowles v*. *Antonetti*, *supra*, 241 Cal.App.2d at pp. 286-287; see also *El Dorado*, *supra*, 244 Cal.App.4th at p. 963; *Vernon*, *supra*, 107 Cal.App.3d 802.)  It has the affirmative effect of "undoing" the invalid act without impermissibly infringing on legislative powers.

54

During oral argument, the City framed its claim that PERB's remedy is ineffective, rendering its decision advisory, as a jurisdictional issue. Arguing that PERB's remedy of rescission has no practical effect, the City maintained that under *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072 (*Coachella Valley*), PERB's inability to order relief equivalent to an action in quo warranto divested it of its exclusive jurisdiction over the matter at hand. In *Coachella Valley*, the Supreme Court held that "[i]n deciding whether to entertain a claim that an agency lacks jurisdiction before the agency proceedings have run their course, a court considers three factors: the injury or burden the exhaustion will impose, the strength of the legal argument that the agency lacks jurisdiction, and the extent to which administrative expertise may aid in resolving the jurisdictional issue." (*Id.* at p. 1082.)

Although the City repeatedly cited to *Coachella Valley* during oral argument, we are unable to find a citation to this case and an analysis of the factors set forth therein in the City's opening brief, appellant's reply brief, or supplemental brief. And the only reference to PERB's alleged lack of jurisdiction is found in the City's reply brief, where the City states in a conclusory fashion that "PERB's exclusive jurisdiction over alleged MMBA violations does not extend to those matters over which it lacks the authority to furnish relief equivalent to the relief that would be provided by a trial court." Ordinarily, we will not consider points raised on appeal for the first time in a reply brief or at oral argument. (*Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 226; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4.) Additionally, aside from the its argument that PERB is unable to order an effective remedy, the City did not provide specific arguments or analysis of the three factors discussed in *Coachella Valley* during oral argument or in its briefs. Points that are raised

55

that are not supported by reasoned argument and citations to authority may be deemed forfeited. (*People v. Stanley*, *supra*, 10 Cal.4th at p. 793.)

Furthermore, *Coachella Valley* is distinguishable from the facts of this case. In *Coachella Valley*, the Supreme Court considered whether the doctrine requiring exhaustion of administrative remedies barred a complaint filed in superior court challenging PERB's jurisdiction. (*Coachella Valley*, *supra*, 35 Cal.4th at p. 1077.) The complaint was filed in the superior court after PERB filed an unfair practice charge, and the main argument in the complaint was that PERB lacked jurisdiction to issue the unfair practice charge, because the applicable limitations period for MMBA unfair practice charges was six months. The Supreme Court noted that "exhaustion of administrative remedies may be excused when a party claims that 'the agency lacks authority, statutory or otherwise, to resolve the underlying dispute between the parties.' " (*Id.* at pp. 1081-1082.)

The Supreme Court then concluded all three factors favored judicial intervention: (1) although there was no showing that the parties would suffer unusual or irreparable injury if it were required to litigate the unfair practice charge to completion before obtaining a judicial resolution on the jurisdictional limitations issues, there was a significant public interest in obtaining a definitive resolution to the fundamental legal issue, (2) there was a strong and persuasive argument that the proper limitations period *was* six months, contrary to PERB's decision, and (3) judicial intervention would not deny the court of PERB's expertise, because the issues are purely legal and the court had already received the benefit of PERB's view on the matter through its briefs. (*Coachella Valley*, *supra*, 35 Cal.4th at pp. 1082-1083.) Thus, the *Coachella Valley* court concluded the plaintiff was excused from exhausting its administrative remedies with PERB. (*Id.* at p. 1083.)

56

In sum, *Coachella Valley* does not stand for the proposition that PERB is necessarily divested of its initial exclusive jurisdiction if it is unable to order a certain remedy, such as the invalidation of a charter amendment. Rather, *Coachella Valley* discussed whether the parties in that particular situation were required to exhaust their administrative remedies by going through PERB before filing a complaint with the superior court. Here, the parties have essentially completed the process of exhausting administrative remedies with PERB. Having exhausted administrative remedies, the City now seeks to use *Coachella Valley* as a means to invalidate PERB's decision by arguing PERB was divested of its jurisdiction in the interim. *Coachella Valley* did not discuss this issue, and cases are not authority for propositions not considered. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

The City's argument on this point also circles back to its claim that PERB's ordered remedies are ineffective. In its briefs and during oral argument, the City has maintained that PERB lacks authority to invalidate the ballot measure, and that authority lies exclusively with the courts by a quo warranto writ. (*International Assn. of Fire Fighters v. City of Oakland*, *supra*, 174 Cal.App.3d at p. 698.) Specifically, during oral argument the City pointed to footnote 7 in *Oakland*, which states: "Appellants attempt to separate the *resolution* proposing the amendments being placed on the ballot from the *enactment* of the amendments themselves. Since the resolution was indisputably the first step in the 'purported enactment of . . . the amendment[s],' i.e., inextricably part and parcel of the procedural regularity of the process of enactment, we view any attempted distinction along these lines as bootless." (*Id.* at p. 692, fn. 7.)

Here, however, it is clearly within PERB's initial jurisdiction to adjudicate alleged violations of the MMBA. (*City of San Jose v. International Assn. of Firefighters*, *Local 230* (2009) 178 Cal.App.4th 408, 413-414.) And we are in agreement with the City that an action in quo warranto is the exclusive remedy to challenge the ballot initiative to

57

repeal article V of the city charter. The election, however, does not render the unfair practice charge moot. It also does not cause PERB's decision to become merely advisory. PERB was able to determine that the City engaged in an unfair practice. PERB was also able to effectively order certain remedies. It was able to order the City to cease and desist from refusing to meet with the IAFF's members prior to adopting ballot measures to voters to establish or modify rules or regulations for the administration of employer-employee relations, and to post at all work locations in the City a copy of the notice describing PERB's orders. Furthermore, PERB was able to determine that the City violated the MMBA when it failed to consult in good faith with the IAFF. As the IAFF points out, it may separately elect to pursue the remedy of an action in quo warranto with the trial court.

Additionally, although we have determined that PERB could not direct the City Council to rescind its resolution, we have also found it would be within PERB's powers to declare the resolution, passed in violation of section 3507, to be void. PERB did not order this remedy in its decision. "The initial determination as to whether the charge of unfair practice is justified, and, if so, the appropriate remedy necessary to effectuate the purposes of the chapter, shall be a matter within the exclusive jurisdiction of the board . . . ." (§ 3509, subd. (b).) We therefore remand the matter to PERB so that it may determine whether this remedy should be ordered.

## DISPOSITION

The Public Employment Relations Board (PERB) decision is annulled. On remand, PERB is directed to strike its order directing the Palo Alto City Council to rescind its action of July 18, 2011. The matter is remanded to PERB to order any other appropriate relief consistent with the views expressed within this opinion. Each party shall bear its own costs on appeal.

58

                                                    _____
                                                            Premo, J.


WE CONCUR:



_____
        Rushing, P.J.




_____
        Grover, J.




City of Palo Alto v. Public Employment Relations Board
H041407

| Trial Court: | Santa Clara County Superior Court Public Employment Relations Board Decision No. 2388-M Case No. SF-CE-869-M |
|---|---|
| Trial Judge: | NOT APPLICABLE |
| Counsel for Petitioner: City of Palo Alto | RENNE SLOAN HOLTZMAN SAKAI Jonathan Holtzman Charles D. Sakai Randy Riddle Erich W. Shiners |
| Counsel for Respondent: Public Employment Relations Board | J. Felix De La Torre General Counsel Wendi L. Ross Deputy General Counsel Miles E. Locker Senior Regional Attorney |
| Counsel for Real Party in Interest: International Association of Firefighters, Local 1319, AFL-CIO | MASTAGNI HOLSTEDT David E. Mastagni Isaac S. Stevens Jeffrey R.A. Edwards Erich A. Knorr John A. Melis |
| Counsel for Amicus Curiae: League of California Cities Supporting The City of Palo Alto | MEYERS, NAVE, RIBACK, SILVER & WILSON Arthur A. Hartinger Linda M. Ross Jasleen Ahuja |

City of Palo Alto v. Public Employment Relations Board
H041407